**SOUTHWIRE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 23800.

United States Court of Appeals
Fifth Circuit.

Aug. 2, 1967.

Frank M. Swift, Atlanta, Ga., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Leonard M. Wagman, Atty., NLRB, Washington, D. C., Morgan C. Stanford, Atlanta, Ga. (Intervenor), for respondent.

Before BROWN, Chief Judge, BELL, Circuit Judge, and BREWSTER, District Judge.

GRIFFIN B. BELL, Circuit Judge:

This case comes to the court on the petition of Respondent for review of a decision and order of the Labor Board and on the cross-petition of the Board for enforcement of the same order.[1]

Respondent, with approximately 900 employees in its plant in Carrollton, Georgia, a town of some 11,000 people, is engaged in manufacturing wire cable and related products. The unsuccessful efforts of unions to organize its employees in the past have resulted in prior proceedings in this court. See NLRB v. Southwire Company, 5 Cir., 1963, 313 F.2d 638 and NLRB v. Southwire Company, 5 Cir., 1965, 352 F.2d 346. In those cases we enforced orders with respect to nine out of ten employees found by the Board to have been discriminatorily discharged in violation of § 8(a) (3) and (1) of the Act. 29 U.S.C.A. § 158(a) (3) and (1). We also enforced with respect to findings of employee interrogation violative of § 8(a) (1) of the Act. 29 U.S.C.A. § 158(a) (1).

In the latter case we observed that Respondent is opposed to the unionization of its employees and has sought to leave no one in doubt of that fact. One method of putting its position across was through the distribution of a booklet to new employees. The booklet contained company rules and other data including a "Statement on Unionism" as follows:

"We are convinced that wherever there are unions there is trouble, strife and discord and that a union would not work to our employees' benefit. In view of this it is our positive intention to oppose unionism by every proper and legal means."

We concluded that this statement was not improper. 352 F.2d 346, supra, at p. 348. We pointed out that Respondent had the right to make its opposition to unionization known so long as it was done in a fair presentation of its views. In this same case we refused to enforce that part of the order which restricted Respondent's prospective conduct by proscribing the violation of § 7 of the Act, 29 U.S.C.A. § 157, "in any other manner", in addition to the usual cease and desist language related to the specific unfair labor practices found. We did not consider the record as warranting an order of such breadth and limited its effectiveness to future conduct of a "like or related manner" to that already found to be in violation of the Act.

In the instant proceedings the Trial Examiner held that Respondent had violated § 8(a) (1) of the Act by threatening to discharge employee Shoemake because of his union activity, and also by showing the film "And Women Must Weep" to its employees as part of its new employee orientation program. The Examiner concluded that the company did not violate § 8(a) (3) and (1) of the Act by discharging employees Shoemake, Suddeth, and Mabry. The Board, however, disagreed with respect to these employees and concluded that Respondent had discharged them because of their protected union activity and had thus violated the Act. These holdings constitute the issues on appeal together with the additional contention that the order is overbroad.

I.

We have carefully examined the record as a whole. The § 8(a) (1) violation based on the threatened discharge is clear. The violation of the Act is complete when Respondent threatens an employee with discharge because of his union activity. NLRB v. Movie Star, Inc., 5 Cir., 1966, 361 F.2d 346 and NLRB v. Griggs Equipment, Inc.,

---

1. Reported as Southwire Company, 1966, 159 NLRB 32.

5 Cir., 1962, 307 F.2d 275. The undisputed evidence makes out such a case.

■■ The evidence with respect to the discharge of the three employees presents a closer case. The Board drew inferences from the evidence of record contrary to those of the Trial Examiner. The evidence disclosed reasons for the discharge of all three of the employees which would support a finding that the discharges were not the result of antiunion motivation. The Examiner chose this route but the record also contains facts which would support an antiunion employer motive in each discharge and the Board took this choice. In two recent cases we have gone fully into the rules which are applicable in reviewing cases such as this where the Board has substituted its judgment for that of the Examiner. NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir., 1967, 374 F.2d 197; NLRB v. Camco, Inc., 5 Cir., 1966, 369 F.2d 125. The Board is to resolve factual discrepancies and conflicting inferences which may be drawn from the facts. We are not faced here with a problem of credibility choices as between the Examiner and the Board but simply a question of the Board having drawn different inferences from the same facts. The evidence on the record as a whole reasonably supports the inferences drawn by the Board and there the matter ends. The causal connection between Respondent's antiunion motivation and the discharges was established. That was the burden of the Board and where it is sustained, as here, the order is to be enforced.

We enforce as to the § 8(a) (1) violation based on the threat of discharge and as to the § 8(a) (3) and (1) violations based on the discharge of the three employees. This leaves for resolution the objection to the breadth of the order and the § 8(a) (1) violation based on the film.

■ As noted, in NLRB v. Southwire Company, 352 F.2d 346, supra, we declined to enforce an order which, in addition to the injunction as to specific con-

duct, would have enjoined Respondent from violating § 7 of the Act "in any other manner". We said that an order prohibiting conduct beyond the specific acts found by the Board as unfair labor practices should be limited to those cases where the Respondent had demonstrated a proclivity to violate the Act. Our limitation of the effectiveness of the order as against future conduct to that which would violate the Act in a like or related manner was in keeping with the teachings of May Department Stores v. NLRB, 1945, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; and NLRB v. Express Publishing Company, 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. In the *Express Publishing Company* case the court cautioned against an order of such breadth as to contemplate the enforcement of the Act by the courts in contempt proceedings and where matters would be involved which had not been in controversy before the Board and which were not similar or fairly related to unfair labor practices which the Board had found. The court stated:

"To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past."

The employer there was charged with violating § 8(a) (5) of the Act, 29 U.S. C.A. § 158(a) (5), by refusing to bargain. There was neither a charge nor a history of other violations of the Act. The broad order was denied.

■ We have enforced orders of the kind here involved in cases where the record demonstrates a proclivity on the part of the employer to disregard the Act; otherwise such proposed orders have been limited to like or related conduct. Each case turns on its own facts. See NLRB v. Bama Company, 5 Cir., 1965, 353 F.2d 320; Truck Drivers & Helpers Local Union No. 728 v. NLRB, 5 Cir., 1964, 332 F.2d 693; NLRB v. Moore Dry Kiln Company, 5 Cir., 1963, 320 F.2d 30; NLRB v. Lindsay News-

papers, Inc., 5 Cir., 1963, 315 F.2d 709; NLRB v. Boman Transportation, Inc., 5 Cir., 1963, 314 F.2d 497; NLRB v. Galloway Mfg. Corp., 5 Cir., 1963, 312 F.2d 322.

█ Respondent's conduct here and in previous litigation has involved violations of § 8(a) (1) through interrogations, threats and general interference with rights of its employees to self-organization under the Act, and to discriminatory discharges in violation of § 8(a) (3) and (1). We treat the proposed order [2] which is in the general language of § 7 of the Act as being limited to this type of unfair labor practice conduct and as such it will be enforced. We think that Respondent had demonstrated a proclivity to violate these sections of the Act but there is no basis for finding a predisposition to violate other sections of the Act. Violations outside the class with which we are dealing should be left to the normal unfair practice procedures under the Act rather than to the contempt power of the court. NLRB v. Express Publishing Company, supra.

## II.

This leaves for decision the question of the film "And Women Must Weep". The Trial Examiner posed the issue as whether the film constituted a "threat of reprisal" to Respondent's employees for engaging in union activities. He reached no conclusion on the point but did conclude that it had the effect of restraining and coercing the employees in the exercise of their § 7 rights and that it thus violated § 8(a) (1) of the Act. The Board affirmed this conclusion but one of the three Board members hearing

the case found it unnecessary to consider the film in his resolution of the case.[3]

The Board has considered the same film on three prior occasions. In two cases elections were set aside based on the fact that the film was exhibited by the employer to its employees in mass meetings during election campaigns; one day before the election in one case and twelve days before the election in the other. See Plochman & Harrison—Cherry Lane Foods, Inc., 1962, 140 NLRB 130; and Carl T. Mason, Inc., 1963, 142 NLRB 480. In each of these cases two of the five members of the Board dissented on the ground that the film was non-coercive and that it was permissible campaign propaganda. The majority was of the apparent view that the film transgressed the requirement of the Board that laboratory conditions prevail in elections. See General Shoe Corporation, 77 NLRB 124, 127. The three members making the majority considered the film again in Bannon Mills, Inc., 1964, 146 NLRB 611, but deemed it unnecessary to decide whether it violated § 8(a) (1). The Trial Examiner had concluded that it did because it was exhibited during an organizing campaign, and management had misrepresented the film to the employees as being a true story of the strike with the scenes being performed by the actual participants therein.

The exhibition of the film in this case is not related to the election campaign other than in the indirect way that it had been shown for three years to all new employees, as they are hired, as part of the new employees orientation course. The evidence was that it was sometimes shown to as few as two mem-

---

2. "(c) In any other manner interfering with, restraining, or coercing its employees in the exercises of the right to self-organization, to form, join, or assist labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection or to refrain from any or all such activities."

3. Although so holding, the Board eliminated the provision in the Examiner's suggested order wherein Respondent was directed to cease and desist from showing the film to its employees. It made no reference in its order to the film but the holding, nevertheless, effectively chills Respondent's right to use the film and we consider the question ripe for review.

bers at a time. There was no statement whatever by management either before or after showing of the film with respect to it.

The question presented is whether Respondent committed an unfair labor practice by showing the film in this context. It was a question of first impression before the Board as an § 8(a)(1) violation. The entire treatment of the question is in footnote 2 of the Board's decision where it is stated that two of the three members considering the case found that the film violated § 8(a) (1) for the reasons stated by the Trial Examiner and "under the circumstances of this case". The Trial Examiner's reasons included the previous Board decisions in election cases, supra; that the employees were a captive audience in that they were required to view the film; and the setting of the plant. The observation was that since the plant is located in a small town, the employees had advance knowledge of the company's strong opposition to unionization and of its successful efforts to keep unions out of its plant.

■ We know of no law which requires an employer to withhold knowledge of its opposition to unionization. The law is just the opposite as we were careful to point out in Southwire Company v. NLRB, 352 F.2d 346, supra. This is a part of free speech. This leaves three possible reasons for the Examiner's conclusion. First, the Board had previously held that the film contained prejudicial misrepresentations of such a nature as to vitiate elections. Second, the film has a strong emotional impact on its viewers because of the use of professional actors and because of the facts which are portrayed, and this impact works against the union movement. The third reason is that the employees are captives in that they

are required to view the film as part of their orientation. These reasons must be measured against Respondent's right to free speech under the First Amendment and under § 8(c) of the Act.[4] 29 U.S.C.A. § 158(c).

At this point we must consider the nature and content of the film. There is no evidence that the film contains factual misrepresentations. The Board noted in Plochman & Harrison—Cherry Lanes, Inc., supra, that the strike which is portrayed did, in fact, occur and that there was a court injunction against picket line violence by the union and interference with legitimate picketing by the company. The Board went on to say that there was no evidence before it to prove that the acts which are portrayed actually occurred.[5]

The film begins:

### KANSANS FOR THE RIGHT TO WORK
Presents
### —AND WOMEN MUST WEEP!
Produced by
### CENTRON CORPORATION
### A KANSAS CORPORATION

It is in color. It tells the story of a strike in Princeton, Indiana. The actors and actresses are professionals. The film is narrated by one of the actresses who plays the part of the wife of a minister whose parishioners are involuntarily involved in the strike as members of the union. They are among the union members who are dictatorily mistreated by the majority of the union members. The majority provoked the strike to serve the wrongful ends of one union officer. The minority of the members who oppose the strike are deprived of their rights by the majority. The strike was called without consulting the International.

4. 29 U.S.C.A. § 158(c):
"The expressing of any views, argument or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

5. Apparently the Board placed the burden on the employer to show the truth of the film.

Among other baneful events, the film shows picket line violence, the minister being jeered, smashed windshields, slashed tires, and upturned automobiles, all caused by the majority members of the union. The minister's wife is threatened by an anonymous caller who announces that her home will be the next to be bombed. The minister is shown with a rifle, sitting through the night, in an effort to protect his family. The climax of the fray is reached when the strikers fire into the trailer home of a dissenting union member and a bullet strikes his baby in the head. The film closes with the end of the strike and with the announcement that the baby will live. The closing words of the narrator are: "All you have to do is ask yourself, Could my town be next? And if you think that the answer of what happened to us couldn't happen to you, remember that is what we thought in the beginning. Must you wait to come face to face with tyranny as we did."

It is fair to say that the film places the church, morality, fair dealing, town pride and law and order on the side of those who object to unions and pits these forces against unfaithful union leaders, engaged in usurping power for their own ends and in gross violence. It shows the bad side of unionism and is designed to discourage union membership. Its impact is such that the union involved in the strike has created an answering film entitled "Anatomy of a Lie".[6]

We consider the question in the context presented: Exhibition of the film in new employee orientation and not during a period immediately proceeding an election. Also, there is no contention that the union did not have ample time to reply to the film as might have been the case if it had been shown in an election campaign and thus we need not consider this problem.

We begin by saying that whatever the case, the film is not an unfair labor practice unless it amounts to a threat of re-

prisal or force by Respondent against its employees or a promise of a benefit. This is the language of § 8(c), supra, footnote 4. We are concerned only with the threat of reprisal or force provision.

The film here is not a documentary but there could hardly be any objection to showing a documentary so we can take a documentary as a bench mark. The film here is professionally staged but the record is barren of evidence showing that it is false or even that it is exaggerated. We can surmise that it contains exaggerations at least in the form of emphasis since its purpose is to promote right to work laws and there is no reason to believe that its sponsors have not emphasized the facts against the union movement. In the circumstances of this particular case we treat the film as antiunion propaganda and assume that it is an exaggeration of the strike which it claims to depict so as to reflect unfavorably on unions generally. Even so, it would appear to be encompassed in the employer's right to free speech.

 The Supreme Court has made it clear that both sides have the right in a labor dispute to express opinions. This right arises under the First Amendment as a part of freedom of speech and freedom of assembly. NLRB v. Virginia Electric & Power Company, 1941, 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; and Thomas v. Collins, 1945, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. These cases envision free discussion in labor relations including opinions as to the advantages and disadvantages of unions. The film in question, even assuming that the facts are highly exaggerated, without more, falls into the category of opinion. Whether there is more is the real question at issue for these decisions make it clear that the right of free speech in the industrial society is not absolute. It must be balanced against the right of the employees to self orga-

---

**6.** See Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harp.Law Rev. 38, 67, Footnote 67.

nization under § 7 of the Act. The court said in Thomas v. Collins, supra:

"Accordingly, decision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. Decisions of other courts have done likewise. When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. Cf. National Labor Relations Board v. Virginia Electric & Power Co., supra. But short of that limit the employer's freedom cannot be impaired. The Constitution protects no less the employees' converse right. Of course espousal of the cause of labor is entitled to no higher constitutional protection than the espousal of any other lawful cause. It is entitled to the same protection." (323 U.S. at pp. 537–538, 65 S.Ct. at 326)

Section 8(c) of the Act was enacted in 1947 to strike the necessary balance. The employer may express views or opinions or argue without committing an unfair labor practice so long as his expression does not contain a threat of reprisal or force or promise of benefit. This is the language of § 8(c) and the expression may be in written, printed, graphic or visual form. The legislative history of § 8(c) indicates that it represented an effort by Congress to define the § 8(a) (1) language making it an unfair labor practice for an employer to "interfere with, restrain or coerce" employees in the exercise of the § 7 rights. The employee is interfered with, restrained or coerced when the employer expresses views, argument or opinion only if the expression contains a threat of reprisal or force or promise of benefit. H. Rep. No. 245 on H.R. 3020, 80th Cong., 1st Sess., 8, 33, (1947); S. Rep. No. 105 on S. 1126, 80th Cong., 1st Sess., 23–24, (1947); H. Conf. Rep. No. 510 on H.R. 3020, 80th Cong., 1st Sess., 45, (1947).

See also Cox, Some Aspects of the Labor Management Relations Act, 61 Harv.L. Rev. 1, 15–19, (1947); Wollett and Rowen, Employer Speech and Related Issues, 16 Ohio State L.J. 380 (1955). On speech and representation elections, see Bok, 78 Harv.L.Rev. 38, 66, supra, footnote 6. These references show that Congress was dissatisfied with Board rulings in the free speech area based on the § 8(a) (1) language and the more definitive language of § 8(c) was the result.

The guaranty of freedom of speech and assembly to the employer and to the union goes to the heart of the contest over whether an employee wishes to join a union. It is the employee who is to make the choice and a free flow of information, the good and the bad, informs him as to the choices available. It is an adversary proceeding and hardly impartial but there is a limit. We conclude that Congress set the limit in § 8(c) and there is no contention that the limit contravenes the First Amendment. Whatever amounts to a threat of reprisal or force or a promise of benefits is beyond the pale. This is the congressional definition of coercion as used in Thomas v. Collins, supra.

The law has developed in this area to distinguish between a threat of action which the employer can impose or control and a prediction as to an event over which the employer has no control. The threat is not privileged but the prediction is. See NLRB v. Transport Clearings, Inc., 5 Cir., 1962, 311 F.2d 519; Texas Industries, Inc. v. NLRB, 5 Cir., 1964, 336 F.2d 128; NLRB v. Brownwood Manufacturing Company, 5 Cir., 1966, 363 F.2d 136. Respondent urges that the content of the film amounted to no more than a mere prediction since it had no control over what a union might do. We find, however, in the view we take of the case that it is unnecessary to reach this defense. We rest our decision instead on the absence of proof, based on a consideration of the record as a whole, that the film

constituted a threat of reprisal or force by Respondent against its employees.

The reasons stated by the Examiner for his decision are inadequate. It is true that the film is highly emotional and that its impact against unions is probably strong but we do not believe that free speech is limited to non-emotional or non-impact speech. No such limitation on the right to speak can be sustained unless there was a threat of reprisal or force. It is also a fact that the employees were captives in that they were required to view the film but Respondent had the right to express its views to its new employees through the use of the film in the orientation program so long as there was no threat of reprisal or force. The Examiner's other reason was that the film contained prejudicial factual misrepresentations. This may or may not be true but we will never know from the record before us. We thus do not reach the legal question of whether and to what extent factual misrepresentations may limit free speech. There is simply no evidence of record showing that the film contains factual misrepresentations and no such evidence has been adduced in any other proceeding cited by the Examiner or called to our attention.

The Examiner may have fallen into error by invoking the broad language of § 7 and § 8(a) (1) as a free speech limit. He used the test of restraint and coercion as those terms are used in § 8(a) (1). We do not consider whether the decision could be sustained on this test for, as we have pointed out, § 8(c) is the limit. Neither the Examiner nor the Board reached the question of whether there was a threat of reprisal or force by Respondent in the use of the film. The Examiner began by posing this as the issue but never answered his own question. He switched off to the broader language of § 8(a) (1). The Board, as noted in footnote 3, supra, made no independent finding on this question and did not order Respondent to cease and desist from showing the film.

 The record before us, considered as a whole, does not show that the film constituted a threat of reprisal or force by Respondent to its employees. Enforcement will be denied as to the holding that the film constituted a § 8(a) (1) violation in the circumstances of this case. The order will be enforced as to the § 8(a) (1) violation based on the threat and as to the three § 8(a)(3) and (1) violations. It is modified as to the broad order provision and, as such, will be enforced.

Enforced in part; denied in part; modified in part.