FREMONT NEWSPAPERS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 20016.

United States Court of Appeals, Eighth Circuit.

Dec. 22, 1970.

William G. Line, Fremont, Neb., for petitioner.

Janet S. Morris, Atty., N.L.R.B., Washington, D. C., for respondent.

Before GIBSON and LAY, Circuit Judges, and HUNTER, District Judge.

ELMO B. HUNTER, District Judge.

On October 28, 1969, the National Labor Relations Board entered its decision and order finding that Fremont Newspapers, Inc., had violated Section 8(a) (1) and (5) of the National Labor Relations Act by engaging in "independent unfair labor practices aimed at causing disaffection" among its employees with regard to union membership and by refusing to bargain with the Omaha Typographical Union No. 190, AFL–CIO, and Stereotypers and Electrotypers Local No. 24, AFL–CIO. That decision and order is reported at 179 NLRB No. 63. Fremont Newspapers, Inc., has petitioned this court to review certain portions of the Board's decision and order. The Board has cross-petitioned for enforcement of its order. Jurisdiction is founded upon Section 10(e) and (f) of the Act.

### Background

Fremont Newspapers, Inc. is a Nebraska corporation with its principal place of business in Fremont, Nebraska. It is engaged in the publication of a daily newspaper in that area and exceeds $200,-000 in annual gross volume of business. On August 7, 1967, following an election in which Fremont's employees voted 16 to 1 in favor of Union representation, the Omaha Typographical Union No. 190, AFL–CIO, and the Stereotypers and Electrotypers Local No. 24, AFL–CIO, were jointly certified as the exclusive collective bargaining representatives (the Union) of the Company's mechanical employees. From October, 1967, through

July 1968, the Company and the Union conducted approximately thirty bargaining sessions concerning a collective agreement between them. However, no such agreement was reached, and during the last bargaining session in July of 1968, the Company and the Union agreed to meet again on August 27, 1968 for further negotiations.

Prior to the scheduled bargaining session of August 27, 1968, Thomas Leckenby, a composing room employee of the Company and then "chapel chairman" or shop steward of the Union, had become disenchanted with the Union and spoke to several other employees about leaving the Union to form their own independent employee union to bargain with the Company. On August 20, 1968, three days after his preliminary conversations with the other employees, Leckenby gathered the Union members for a meeting in the conference room of the Fremont plant.

During the August 20th meeting, Leckenby suggested to the employees that they should file a decertification petition and "form our own union." Although the details of the meeting are not entirely clear, it is apparent that Leckenby's suggestions were received by the employees with mixed feelings. Some disagreement arose among the participants at the meeting which resulted in Leckenby's resignation as "chapel chairman" and the election of Duane Nielson, an employee who supported the Union, in Leckenby's place. Immediately after the meeting and his resignation as shop steward, Leckenby continued to speak to employees about decertification of the Union and he mentioned that he would prepare a decertification petition for signature by employees for submission to the regional office of the National Labor Relations Board. The next day, August 21, 1968, Leckenby sent a letter (later termed an "informal decertification petition"), signed by nine out of seventeen members of the bargaining unit, to the regional director of the National Labor Relations Board. That letter, or informal decertification petition, stated that the employees who had signed

the document no longer desired representation by the Union and that they therefore desired a decertification of the Union. On behalf of himself and certain other employees, Leckenby sent telegrams on the same day to the regional director of the National Labor Relations Board and to the Union, stating the desire of the employees to leave the Union.

Shortly after the mailing of the letter and the transmission of the telegrams, Leckenby was called into the publisher's office by mechanical superintendent Arlen R. Sollenberger. Leckenby then showed Richard Schuster, president and publisher of Fremont, an unsigned copy of the informal decertification petition. Upon Schuster's suggestion that the document be endorsed, Leckenby made the following notation:

"Presented to Pub. Schuster August 21, 1968, 4:00 P.M. This is to certify that the original of this letter has been sent to the National Labor Relations Board in Kansas City, signed by a majority of the Bargaining Unit members."

The document was then shown to Schuster for a second time.

After Schuster had been shown the informal decertification petition, he sent a telegram to the Union stating that the Company had been informed by a majority of the members of the bargaining unit that decertification of the Union had been requested by them and that, under the circumstances, further meetings between Company representatives and Union representatives should be suspended until the situation had been clarified. That telegraphic communication was immediately followed on the same date with another telegram from Schuster which stated the Company's willingness to meet with Union representatives.

On August 27, 1968, representatives of the Company and of the Union attended the scheduled meeting. However, at that meeting, Company representatives presented to the Union a letter which declared that the Company would continue

to meet with Union representatives, but that it would not enter into a final and binding agreement while decertification proceedings were pending. Both parties then agreed that further meetings between them would be futile. Since that date there have been no negotiations between the Company and the Union regarding a final agreement, nor has either party subsequently requested such negotiations.

On August 27, 1968, the day of the last bargaining session between the Company and the Union, a formal decertification petition signed by Thomas Leckenby was filed at the regional office of the National Labor Relations Board in Kansas City, Missouri. The petition was later dismissed in light of the pending unfair labor practice charge proceedings brought by the Union which are now before this Court on review. The dismissal of the petition was affirmed by the Board on November 21, 1968.

### The Unfair Labor Practice Charges

Two days after the meeting between Union and Company representatives, the Union filed an unfair labor practice charge against the Company, alleging violations of Section 8(a) (1), (2) and (5) of the Act. Later, on October 8, 1968, an amended charge was filed, abandoning the allegation of a Section 8(a) (2) violation and charging the Company with violations of Section 8(a) (1) and (5). In that charge, the Union alleged the following grounds, among others:

"[O]n or about August 15, 1968 officers, agents and representatives of the employer conducted a meeting on the company premises and informed employees in the bargaining unit, without representatives of the [Union] being present, that if they didn't have a union representative then the employer would grant certain wage increases higher and better than those offered

to date to representatives of the [Union]; that the employer, by its officers, agents and representatives, has offered to employees and not to the certified bargaining agent additional benefits and wages for the purpose of discouraging representation by and membership in the [Union] by employees within the bargaining unit."

\*     \*     \*     \*     \*     \*

"That the employer, by the above acts and by other acts, has failed and refused to bargain collectively in good faith with the [Union] as certified bargaining agent for employees within the bargaining unit and has deliberately engaged in stalling tactics in negotiations for the purpose of discouraging membership in the [Union] of employees in the bargaining unit."

A complaint was thereafter issued by the regional director of the National Labor Relations Board, charging that the Company, through a supervisor, had impliedly promised members of the bargaining unit increased wages and additional economic benefits if they would repudiate the Union; that the Company, through its supervisor, had encouraged the employees to form an independent Union; and that the Company refused to bargain collectively in good faith with the Union. In response to the complaint, the Company denied that it had encouraged employees to repudiate the Union and alleged that it had discontinued bargaining negotiations with the Union in a good faith belief that the Union had lost its majority membership following the expiration of the certification year.

### Facts of the Charge

As reliably found by the trial examiner,[1] the facts underlying the unfair labor charge are as follows: On August 15, 1968, approximately one week before the filing of the informal decertification petition, Arlen Sollenberger, the Company's

---

1. The facts found by the trial examiner following his hearing of December 10 and 11, 1968, do not appear to be seriously disputed by either party on this review. And, such factual findings are supported by substantial evidence of record. As will later be discussed, the points of controversy on review concern the appropriateness of the action taken by the Board based upon those facts.

mechanical superintendent, whose supervisory status is not disputed,[2] conversed with one Loren Sass, an employee of the Company and a member of the Union. During the course of this conversation, Sollenberger told Sass that the Company president had stated that the Union had taken a year to negotiate without results and "now [the Company president] would like a year to show what he could do." Sollenberger also informed Sass that if the employees "backed out of the Union" anyone "who was a competent journeyman * * * would get three thirty an hour."[3] Sass was further informed that the Company "would be easier to deal with and go (sic) further if [it] was dealing with the employees."

Eight days later, on August 23, 1968, Sollenberger spoke to another member of the bargaining unit, Duane Nielson, the newly-elected shop steward of the Union. Although Sollenberger first began by reprimanding Nielson with regard to his work performance, he later discussed Union representation and wages. As in his earlier conversation with employee Sass, Sollenberger again inquired as to why the employees "couldn't get out from the local and form [their] own Union." He also suggested that $3.50 an hour would be a fair wage and asked "why we couldn't negotiate wages first and * * * get away from all that other stuff that was taking so long."

The mentioned conversations between Sollenberger and Sass, and between Sollenberger and Nielson were lengthy. However, as found by the trial examiner,[4] these two conversations were conducted outside the hearing of other employees and were not later disclosed to any other persons, particularly not to other members of the bargaining unit. Neither Sass nor Nielson later withdrew from the Union, nor did employee Sass participate in the signing or filing of the informal decertification petition.[5]

### The Trial Examiner's Decision and Order

Based upon the evidence adduced before him at the hearing, the trial examiner found that the Company, through the conversations of its supervisor with employees Sass and Nielson, had violated Section 8(a) (1) by encouraging members of the bargaining unit to repudiate their Union membership. He found, however, that those Section 8(a) (1) violations were "not so widespread as to taint [the Company's] claim as to the Union's continued majority" since the conversations involved only two of the members of the bargaining unit, the representations of the supervisor remained undisclosed to other employees, and the employees involved did not defect from the Union. The trial examiner concluded that there existed a "sufficiently reasonable basis" for the Company's good

2. Testimony was adduced at the hearing that Sollenberger had been expressly instructed by the Company president not to discuss wages, working conditions, or matters which were the subject of negotiation between the Company and the Union. However, the trial examiner found that, in view of Sollenberger's wide range of authority, the Company should be held liable for his conduct with regard to the Section 8(a) (1) violations. On review, the Company does not contest this finding.

3. At the time, the general wage rate was $2.25 an hour for the Company's mechanical employees.

4. As will be shown later, the Board did not reject the findings of the trial examiner with regard to the communication of the content of those conversations to other employees. Nor did the Board reject the trial examiner's finding that employees Sass and Nielson continued to support the Union. Rather the Board held that such circumstances were immaterial to the issue of the Company's refusal to collectively bargain.

5. The conversation with employee Nielson occurred *after* the filing of the informal decertification petition and the Company's notification that it would not enter into a final agreement while decertification proceedings were pending. Thus, the Nielson conversation could not have affected the preparation or filing of that petition which preceded it, nor would it appear that Sollenberger's remarks affected the Company's refusal to bargain based on a lack of Union majority.

faith doubt as to the majority status of the Union by reason of the decertification petition and the representations of Leckenby, the former shop steward, as to the sentiments of the employees. He therefore found that the Company did, in fact, refuse to bargain with a good faith doubt of the Union's majority, and recommended a dismissal of that portion of the complaint charging a violation of Section 8(a) (5) of the Act. The trial examiner also recommended an order requiring: (1) that the Company cease and desist from encouraging employees from repudiating the Union "or any other labor organization," by promising benefits to employees, suggesting that the Company would be more receptive to dealing with the employees if they withdrew from the Union, "or in any other manner"; (2) that the Company cease and desist from interfering with, restraining or coercing employees in the exercise of their right to self organization; and (3) that the Company post notice to employees with regard to the unfair labor practices which he had found.

### The Decision and Order of the Board

The Board found, as had the trial examiner, that the Company had engaged in unfair labor practices within the meaning of Section 8(a) (1) of the Act through the representations of supervisor Sollenberger to employees Sass and Nielson. In that respect, the Board accepted the factual findings of the trial examiner. However, contrary to the trial examiner, the majority of the Board, with one member dissenting, found that under the circumstances of the case it was immaterial that the conversations between supervisor Sollenberger and employees Sass and Nielson were not conveyed to other employees, or that those two employees did not, in fact, defect from the Union. The Board concluded that the Company could not assume that the conversations, made through the Company's supervisor, were unrelated to the decertification petition, or that the remarks made by Sollenberger were not disclosed to other employees.[6] Based upon that finding, the Board found that the Company had also engaged in unfair labor practices in violation of Section 8(a) (5) of the Act by refusing to bargain with a certified bargaining representative of its employees while attempting to influence those employees to repudiate the Union, thus tending to preclude the holding of a fair election. It modified the recommended order of the trial examiner with respect to the Section 8(a) (1) violations and additionally ordered the Company to bargain collectively with the Union.

The dissenting member of the Board disagreed with the majority finding that a Section 8(a) (5) violation could be found under the evidence adduced before the trial examiner. In support of his position, he related that the Company had conducted thirty bargaining sessions with the Union during the certification year; that following the period of certification, the Company was reliably informed by Leckenby that a majority of the members of the bargaining unit had signed a decertification petition; and that no objective evidence existed to show that the conversations of Sollenberger had a discernible effect upon the Union representation. He therefore con-

6. The Board stated:
"Sollenberger is a supervisor, and [the Company] is both responsible for, and charged with knowledge of, his unlawful remarks. At least the Sass incident took place before the decertification movement began and before [the Company] was told that a petition was being filed. When informed of the petition, [the Company] was not told who had signed it. [The Company] at that point could not assume that its own unlawful action, which was de- signed to, or at least would tend to discourage union adherence, had nothing to do with the petition, or that Sass had not been influenced, had not signed the petition, or had not related the unlawful remarks to anyone that had signed it. Indeed, if only one employee had been improperly influenced to sign the petition, it would have been supported by less than an uncoerced majority." Fremont Newspapers, Inc., 179 NLRB No. 63.

cluded that the Section 8(a) (5) charges should have been dismissed.

## The Bargaining Order

While, as later will be discussed, the Company presents certain contentions with regard to the scope of the Board's order to cease and desist and the notice it directed to be posted, the primary issue raised by both parties concerns the propriety of the Board's order to bargain based upon the finding of a Section 8(a) (5) violation. In attacking the bargaining order, the Company contends that, at best, the record demonstrates minor Section 8(a) (1) violations which concededly had no effect upon the Union's majority status. The Company urges that the record, therefore, supports neither the finding that it refused to bargain in good faith, nor the imposition of a bargaining order. The Company does not directly challenge the finding of Section 8(a) (1) violations by the trial examiner and the Board. Rather, it argues that the Section 8(a) (1) violations were, in fact, too minimal in effect to warrant the remedial remedies imposed by the Board.

Conversely, it is the contention of the Board that its finding of a Section 8(a) (5) violation was warranted by substantial evidence which shows that the Company refused to bargain while it engaged in unfair labor practices in violation of Section 8(a) (1) of the Act. The Board urges that the bargaining order was, therefore, appropriate to remedy the Company's withdrawal of recognition from a certified Union. Both parties draw our attention to the recent Supreme Court decision in N.L.R.B. v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1968) to support their respective positions concerning the propriety of the bargaining order under the facts of this case.

■■ While, in the absence of special circumstances, the majority status of a certified Union is conclusively presumed to continue for a one year period following the date of certification, this presumption thereafter becomes rebuttable. Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); Bally Case & Cooler, Inc., of Delaware v. N.L.R.B., 416 F.2d 902 (6th Cir. 1966); N.L.R.B. v. Gulfmont Hotel Co., 362 F.2d 588 (5th Cir. 1966); N.L.R.B. v. Alva Allen Industries, Inc., 369 F.2d 310 (8th Cir. 1966). Following the certification year, an employer may then refuse to bargain with a Union if the employer entertains a "reasonably based doubt asserted in good faith" that the Union does not enjoy a majority status among the members of the bargaining unit. Bally Case & Cooler, Inc., of Delaware v. N.L.R.B., *supra*, 416 F.2d at 905. The employer may not, however, avoid its duty to bargain by showing a loss of Union majority rising from its own independent labor practices. Franks Bros. Co. v. N.L.R.B., 321 U.S. 702, 704–705, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); N.L.R.B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 (8th Cir. 1969).

The conflicting decisions of the trial examiner and the divided Board indicate the difficulties in the application of a rigid "good faith" standard to the exceptional situation in which the independent unfair labor practices have had little or no actual effect upon the union majority status or the election process. As earlier stated, the trial examiner found that the Company had been presented with sufficient information upon which to reasonably base its doubt of the majority status of the Union.[7] This finding is

---

7. The Trial Examiner stated:

"While it may be that the decertification petition alone may not have furnished Respondent with a sufficiently reasonable basis upon which to question the Union's majority, Respondent did not rely on the petition alone. There was also the information it received on about August 22 from Leckenby, one of the Respondent's compositors, that a majority of the employees in the unit had signed the informal decertification petition which he had prepared and sent to the Board's Regional Office in Kansas City.

supported by substantial evidence of record. The trial examiner also found that the independent unfair labor practices (the two conversations of Sollenberger) were not so extensive in practice or in effect to diminish the Company's claim of good faith in refusing to bargain with the Union.

The Board, however, found a Section 8(a) (5) violation in the Company's refusal to bargain. In reaching this determination, it did not factually consider the extensiveness or actual effect of the Section 8(a) (1) violations upon the majority status of the Union.[8] It relied instead upon the premise that, since the Company was responsible for the remarks of superintendent Sollenberger, the Company could not, in good faith, have assumed that "its own unlawful activities" did not erode the Union's majority. Based upon this inference of actual knowledge of the Company as to the actions of its supervisor, the Board determined that the Company had refused to bargain in good faith.[9]

*Discussion of Bargaining Order Issue*

■ In considering the primary issue presented by the parties on this review, we need not consider the question of whether the conduct attributed to the Company rises to a lack of good faith in refusing to bargain with the Union. For, even assuming *arguendo* that the Board's findings of a lack of good faith is based upon a valid inference and premise, we cannot find that the bargaining order of the Board was appropriate under the facts presented by the record. Under the rationale of *Gissel*, "an employer's good faith doubt is largely irrelevant" in determining the propriety of a bargaining order where Union majority is questionable and an employer has refused to bargain. N.L.R.B. v. Gissel Packing Company, 395 U.S. at 594, 89 S.Ct. at 1930. Instead, the test of the propriety of a bargaining order is whether the "employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact under-

"Even if the information Respondent received from Leckenby on about August 22 had been false, Respondent * * * could have acted on the assumption that it was true in view of Leckenby's having been, until August 20, only 2 days earlier, OTU's chapel chairman. Leckenby was thus in a position to know the sentiments of Respondent's employees insofar as the Union was concerned. But Leckenby did not lie. Nine of the seventeen employees in the unit, a majority, had signed the informal petition. The information Respondent received from Leckenby was, indeed, "strong evidence" of an objective nature that the Union no longer represented a majority of the employees, and I so find."

8. "There is, the Board says, no per se rule that the commission of any unfair practice will automatically result in a § 8(a) (5) violation and the issuance of an order to bargain." N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 615, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1968). The nature and extensiveness of an employer's independent unfair labor practices has a substantial bearing

upon the employer's claim of good faith doubt in refusing to bargain. See: N. L. R. B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 (8th Cir. 1969); Arron Bros. Co., 158 N.L.R.B. 1077, 1079 (1966); Hammond & Irving, Inc., 154 N.L.R.B. 1071, 1073 (1965); Seymour Transfer, Inc., 179 N.L.R.B. 5 (1969).

9. As noted previously, the Board charged the Company with responsibility for the unlawful acts of its supervisor with regard to both the Section 8(a) (1) violations and the Section 8(a) (5) violation which it also found. See: 28 U.S.C. § 152(2), (11), and (13); Jas. E. Matthews & Co. v. N. L. R. B., 354 F.2d 432 (8th Cir. 1965), cert. den. 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015. But see: N. L. R. B. v. General Industries Electronics Co., 401 F.2d 297, 300 (8th Cir. 1968); Boyle's Famous Corned Beef Co. v. N. L. R. B., 400 F.2d 154, 166 (8th Cir. 1968). It should again be emphasized that on this review the Company does not challenge its liability for its supervsior's unlawful activities as it concerns the finding of Section 8(a) (1) violations.

mined a union's majority * * *." *Supra* at 594, 613–614, 89 S.Ct. at 1938. Thus, in assessing the appropriateness of a bargaining order in the individual case, we must look to the nature of the employer's independent unfair labor practices and their actual impact upon the majority status of the union and the election process. N.L.R.B. v. Crystal Tire Co., 410 F.2d 916, 920 (8th Cir. 1969).

As affirmatively shown by the record, the Section 8(a) (1) violations found by the Board must be characterized as "minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order."[10] N.L.R.B. v. Gissel Packing Company, 395 U.S. at 615, 89 S.Ct. at 1940. They consisted of remarks made by Sollenberger to two Company employees during separate isolated conversations. Only one of those conversations occurred prior to the Company's refusal to bargain and the filing of the informal decertification petition by the employees. The representations of Sollenberger were never repeated to other employees by either Sass or Nielson. Following the conversations, both employees remained strong Union adherents and took no part in the later filing of the formal decertification petition. Furthermore, there is no showing of record that the Company refused to bargain before it learned that the Union majority was questionable or that it had engaged in a continuous practice in an effort to undermine the majority strength of the Union. Therefore, in light of the objective evidence of record, it is not reasonably possible to find that the independent unfair labor practices here had any effect upon the Union majority or the potential decertification proceedings.[11] As we stated in N.L.R.B. v. Crystal Tire Company, *supra*, 410 F.2d at 920:

"The use of a bargaining order * * is predicated on restoring the status quo between the parties and assumes that the employer's unfair labor practices substantially weakened the employees' adherence to their union."

Here, as demonstrated by the record, the employer's unfair labor practices had no such effect. Thus, we must conclude that the bargaining order of the Board was inappropriate under the circumstances of this particular case.[12]

---

10. The Court in *Gissel* described three general categories within which unfair labor practices fall in determining the use of a bargaining order: (1) "Exceptional" cases marked by "outrageous" and "pervasive" unfair practices the coercive effects of which can only be remedied by a bargaining order; (2) "Less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes"; and (3) cases involving "minor or less extensive unfair labor practices, which, because of their minimal impact upon the election machinery, will not sustain a bargaining order." N. L. R. B. v. Gissel Packing Company, *supra* at 613–615, 89 S.Ct. at 1940. See also: Note, Gissel Packing Company: Bargaining Orders and Employee Free Choice, 45 N.Y.U.L.Rev. 318, 334–335 (1970); Lewis, Gissel Packing: Was the Supreme Court Right? 56 A.B.J. 877, 878 (Sept. 1970).

11. In a recent Second Circuit case involving an employer's refusal to bargain with a certified Union, N. L. R. B. v. Patent Trader, Inc., 415 F.2d 190 (2nd Cir. 1969), the court initially denied enforcement of a bargaining order emphasizing the employee's desire to disaffect from the Union. On rehearing, the court en banc enforced the order to bargain under the rationale of *Gissel*. N. L. R. B. v. Patent Trader, Inc., 426 F.2d 791 (2nd Cir. 1970). There, the independent unfair labor practices were coupled with the employer's continuing refusal to bargain in good faith over a period of one year. More importantly, unlike the situation presented in the instant case, the facts presented in that case strongly indicated that the independent unfair labor practices of the employer had actually undermined union strength and had affected the election process.

12. In reaching this conclusion we are not unmindful that the Board has broad authority in fashioning remedies under the provisions of the Act. See: Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). However, "the

## The Scope of the Board's Order

■ The Company additionally challenges the scope of the Board's order to cease and desist and its order directing the posting of notice, contending that they are too broadly worded.[13] Specifically, the Company urges the deletion of the phrases "or in any other manner" and "or any other labor organization" from paragraph numbered 1(a); the phrase "in like or related manner" in paragraph numbered 1(b); and the use of the phrases "in any way" and "do anything else" in the notice which the Board ordered to be posted.[14]

The Board contends that its order was a "narrow" one, as contrasted with a "broad order," and that the above-mentioned phrases are made either within the context of particularly-described conduct or are sufficiently related to the Section 8(a) (1) violations found by the Board. For these reasons, it urges that its order is not subject to modification on review.

In N.L.R.B. v. Express Publishing Company, 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930 (1941),[15] the Supreme Court defined the scope of the

Board's actions are not completely immune to judicial review where the remedy applied in the circumstances is merely oppressive and not calculated to carry out the policies of the Act." L. C. Cassidy & Son, Inc. v. N. L. R. B., 415 F.2d 1358, 1365 (7th Cir. 1969).

13. The Board's order reads, in relevant part, as follows:
"Fremont Newspapers, Inc., its officers, agents, successors, and assigns shall:
"1. Cease and desist from:
"(a) Causing, inducing, encouraging or requesting employees to repudiate Omaha Typographical Union No. 190, AFL-CIO, and Stereotypers Local No. 24, AFL-CIO, or any other labor organization, by promising benefits to employees, suggesting that they form an independent labor organization, suggesting that respondent would be easier to deal with if they withdrew from any of said labor organizations, or in any other manner. (Emphasis added.)
"(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of their right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the National Labor Relations Act, as amended, or to refrain from any or all such activities." (Emphasis added.)

The notice reads, in part, as follows:
"WE WILL NOT raise your wages, or give you any benefits which you do not now have, and WE WILL NOT promise to do any of these things, (or do anything else) to cause, induce, urge, or encourage you to repudiate, with-

draw from or resign from Omaha Typographical Union No. 190, AFL-CIO, or Stereotypers and Electrotypers Local No. 24, AFL-CIO.
"WE WILL NOT raise your wages, or give you any benefits which you do not now have, or do anything else, or promise to do any of these things, or to do anything else to cause, induce, urge, or encourage you to form your own union or to deal with us without any union.
"WE WILL NOT in any similar way interfere with, restrain, or coerce you in the exercise of any rights guaranteed to you by the National Labor Relations Act. In this connection, WE WILL respect your rights to self-organization, to form, join, or assist any union, to bargain collectively through any union or representative of your choice as to wages, hours of work, and any other term or condition of employment. You also have the right, which WE WILL also respect, to refrain from doing so."

14. The Company also urges the adoption of a notice which it sets forth in its brief, or in the alternative, the Company requests the addition of certain suggested statements. Upon a review of those suggested changes, as read against the Board's order, we find the Company's contentions in this respect to be without merit. See: Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

15. In a different factual situation from that presented here, the Supreme Court recently reaffirmed this standard for determining the proper scope of the Board's orders. See: Communications Workers of America, AFL-CIO v. N.L.R.B., 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960).

Board's authority to restrain other similar unfair labor practices as follows:

> "Having found the acts which constitute the unfair labor practice the Board is free to restrain the practice and other like or related unlawful acts."

Although, in view of their lack of effect upon the Union majority or the potential decertification election, the particular Section 8(a)(1) violations found here by the Board do not support the Board's order as it pertains to the Company's duty to bargain, this does not mean that repeated similar or related conduct in the future would not have an adverse effect upon union representation. Therefore, under the teachings of *Express Publishing Company*, the use of the words "in like or related manner," is proper, particularly in the context of the Board's order here. See: N.L.R.B. v. Mayes Bros., Inc., 383 F.2d 242 (5th Cir. 1967).

Similarly, the use of the phrase "or any other labor organization" is reasonable under the facts presented by the record. As we stated in Singer Company v. N.L.R.B., 429 F.2d 172, 182 (8th Cir. 1970), "[S]ince the relationship between the company and a defeated union is a continuing one only if the same union again seeks to organize the employees, the order can legitimately be made broader to protect any other unions which might try to organize the employees based on the strong possibility that the company's past unfair labor practices were intended to obstruct unionization in general." In the instant case, if the decertification attempts of the employees are successful upon a future election, it is entirely possible that new efforts will be made at further unionizations. Thus, the Board could reasonably make such a finding here and the use of this phrase is valid.[16]

However, even in the context of the Board's order, the use of the phrases "in any manner," "in any other manner," and "do anything else" presents an entirely different matter. Such language is considerably broader than the phrase "in like or related manner" and covers unfair labor practices which the Company has shown no tendency to commit. See, Southwire Company v. N.L.R.B., 383 F. 2d 235, 237 (5th Cir. 1967). The record in this case reveals no proclivity on the part of the Company to pursue a course of other unrelated or dissimilar unfair labor practices in the future.[17] As stated in N.L.R.B. v. Express Publishing Company, 312 U.S. loc. cit. 437, 61 S.Ct. loc. cit. 700. "To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that the danger of their commission in the future is to be anticipated from the course of his conduct in the past." Thus, the Board's order should be and is hereby modified by deleting the phrases "in any manner," "in any other manner," and "do anything else."

Accordingly, to the extent that the Board's order imposes a present duty to bargain, enforcement is denied. Enforcement is granted to the extent that the order, as modified, remedies violations of Section 8(a)(1) of the Act.

It is so ordered.

---

16. See: P. R. Mallory & Co. v. N.L.R.B., 400 F.2d 956, 959 (7th Cir. 1968), cert. den. 394 U.S. 918, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969); Marshfield Steel Co. v. N.L.R.B., 324 F.2d 333, 339 (8th Cir. 1963); N.L.R.B. v. Standard Metal Fabricating, 297 F.2d 365, 367 (8th Cir. 1961).

17. See: N.L.R.B. v. Mayes Bros., Inc., *supra*, 383 F.2d at 248; Southwire Company v. N.L.R.B., *supra* 383 F.2d at 237. Cf., Allegheny Pepsi-Cola Bottling Co. v. N.L.R.B., 312 F.2d 529, 532 (3rd Cir. 1962).