**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GREENSBORO HOSIERY MILLS, INC., Respondent.**

**No. 11909.**

United States Court of Appeals
Fourth Circuit.

Argued March 5, 1968.

Decided July 8, 1968.

Jeffrey G. Spragens, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli,

Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., National Labor Relations Board, on brief), for petitioner.

J. W. Alexander, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for respondent.

Before WINTER and BUTZNER, Circuit Judges, and MacKENZIE, District Judge.

WINTER, Circuit Judge:

Having found that Greensboro Hosiery Mills, Inc. (the "company") violated § 8(a) (1) and (3) of the Labor-Management Relations Act, 29 U.S.C. § 158(a) (1) and (3), the Board petitions for enforcement of its order. The § 8(a) (1) offenses found were threats and disparaging comments to employees, and coercive interrogation, all concerning union activities. Another § 8(a) (1) offense found was the posting of a "serious harm" notice. The § 8(a) (3) offense was the discharge of Eloise Garner.

We agree that several violations of § 8(a) (1) were established, but we do not agree that employee Eloise Garner was discharged in violation of § 8(a) (3) or that, under the circumstances present in this case, the posting of a "serious harm" notice constituted a violation of § 8(a) (1). Thus, enforcement of the Board's order is granted in part, and denied in part.

I

Employee witnesses, whose testimony was accepted by the trial examiner, testified that they were subjected to various forms of questioning and comments concerning the union by company supervisors. Several employees were called into the offices of supervisory personnel, and told that the union was bad for the employees and would not be given a contract by the company even if it succeeded in getting into the plant. One employee was reminded by a supervisor about what had happened at one of the company's former tenants when, after a nine-week strike, that tenant sold out and all of the employees lost their jobs. Another was told that if the union got in, the employees would lose their Christmas bonus and other benefits. Still another was asked if he had talked with anyone from the union, or if any union advocates had visited his house. These incidents provided a sufficient ground for the Board's finding that § 8(a) (1) violations were committed. See, e. g., N.L.R.B. v. Associated Naval Architects, 355 F.2d 788 (4 Cir. 1966); N.L.R.B. v. Herman Bros. Pet Supply, Inc., 325 F.2d 68 (6 Cir. 1963).

II

Mrs. Garner joined the union in December, 1963, being one of the first employees to do so. She testified that she talked a few of her fellow-workers into signing union cards, and from September to December, 1964, held several union meetings in her home. She was discharged on January 29, 1965, under the following circumstances:

On Tuesday, January 26, Mrs. Garner did not go to work, and in the afternoon she called to say that she was not well. She did not go to the plant on either Wednesday or Thursday. Her husband also worked for the company and on Thursday afternoon Edwards, Mrs. Garner's immediate supervisor, asked him how she was. Garner replied that his wife was not sick, but had packed two suitcases and left home with another man on Tuesday morning. Other testimony established that the Garners were having marital difficulties—due to Mr. Garner's "running around"—and that this had affected Mrs. Garner's health, and that on Tuesday she had had her brother pick her up and take her to his home to stay.

On Friday, Mrs. Garner went to the plant, and was discharged by Edwards. He then sent her to Personnel Supervisor Redding for a routine "exit interview." The time when this occurred is in dispute. The trial examiner

found that Mrs. Garner went to the plant on Friday afternoon, but this finding lacks support in the record. The time marked on the company's exit interview form was 10:30 A. M., and Mrs. Garner herself testified that although she could not remember the exact time she saw Redding, it was *in the morning.*

Edwards' discharge of Mrs. Garner was summary. He gave as the reason for his action that her husband had told him that she was not sick, and he stated that "he was sorry that he had to * * * [fire her], because the company officials thought that * * * [she] was one of them." Mrs. Garner told him that her "nerves were shot," and she testified that she attempted to verify her sickness by giving him a doctor's slip which she had obtained. She further testified that she also attempted to show this slip to Redding at the exit interview.

It is at this point that the time of the discharge and exit interview becomes critical. The evidence introduced by the company established that Mrs. Garner went to the doctor at 2:00 on Friday afternoon. The trial examiner was not required to accept this evidence as true. But the earliest that any of the evidence of record established that Mrs. Garner saw the doctor was at 11:30 A.M. The doctor himself testified that he saw Mrs. Garner at "mid-day," which he placed at between 11:30 A. M. and 2:00 P.M. Thus, it is impossible to reconcile Mrs. Garner's story that she offered to show the doctor's slip to Edwards and Redding with the evidence relating to the respective times of the discharge, the exit interview and the visit to the doctor.

Nor did the trial examiner come to terms with this difficulty, because he erroneously recited in his opinion that Redding testified that he held the exit interview with Mrs. Garner on Friday afternoon.[1] This error prevented the trial examiner from seeing the facts in clear focus, and led him to draw an improper inference from the company's refusal to reinstate Mrs. Garner on Monday, when she came to the plant and showed Plant Manager Swindell the doctor's slip in order to prove that she had in fact been sick the previous week.

The trial examiner reasoned that since the reason given for discharging Mrs. Garner was that she had lied about her health and since she was able to prove by virtue of her doctor's slip that she had in fact been sick, it was inferrable from those facts, and the further fact that Mrs. Garner was a known and active member of a labor organization which the company vowed to keep out of its plant, that the company discharged her and refused her reinstatement, for fictitious reasons, designed to conceal a discriminatory motive. We do not see that a discriminatory motive can be inferred, or that the company violated § 8 (a) (3) in acting as it did.

■ At the interview on Monday, Swindell, upon being shown the doctor's slip by Mrs. Garner, asked her why she had not shown it to Redding on Friday. She answered that she had offered to, and Swindell then called Redding, who said that this was an absolute lie. A call to the doctor,[2] as do the facts which we have recited, bore Redding out. Swindell refused to reinstate Mrs. Garner. Correctly, he accused her of obtaining the slip after Friday's inter-

---

1. We do not mean to imply that the trial examiner acted in bad faith as the company suggests. Redding also testified as to the interview which Plant Manager Swindell held with Mrs. Garner on Monday *afternoon.* It is not surprising that the trial examiner's recollection was not totally accurate as to the times of the various interviews.

2. Redding called the doctor immediately after Mrs. Garner had gone. It was a memorandum written after this call stating that the doctor said that Mrs. Garner had seen him at 2:00, plus the doctor's own testimony at the hearing that he saw Mrs. Garner at mid-day, that the company relied upon.

views and untruthfully claiming to the contrary in her interview with him. Under these circumstances, the company was not required to return Mrs. Garner to its employ.

An additional factor that is instrumental in persuading us that no § 8(a) (3) violation has been proven is that there is only a scintilla of evidence in the record that the company knew of Mrs. Garner's union activities. To prove company knowledge, the Board relies solely upon an allegation that Mrs. Garner actively solicited for the union within the plant, that she held union meetings at her home, one of which was observed by Asilee Paschell, whom a Regional Director of the Board in a different proceeding considered to be a supervisor eight months later, and upon the fact that at the time of the discharge Edwards commented that the company officials thought that Mrs. Garner "was one of *them.*"

The only evidence that Mrs. Garner engaged in in-plant solicitation was her own testimony that she procured the signatures of "a couple of" her fellow-employees on union cards. There is no evidence that she did this in an open and notorious manner.[3] Similarly, the record does not show that the company knew of the union meetings held in Mrs. Garner's home; no attempt was made to prove that Asilee Paschell communicated her knowledge of this fact to supervisory personnel, nor was the question of Paschell's supervisory status litigated in this case. Finally, Edwards' remark at the time of Mrs. Garner's discharge is at best ambiguous, and in light of a pre-hearing affidavit in which Mrs. Garner stated that Edwards said that the company thought Mrs. Garner was "one of *us*" this ambiguity must be resolved

against Mrs. Garner. By itself this admission in the affidavit clearly negates the proposition that the company knew of Mrs. Garner's union activity. And additional evidence that on a previous occasion Mrs. Garner had engaged in anti-union activity for the company—reporting to it adverse rumors about the private life of a known union advocate—provides a firm basis for inferring that the company did believe, as Edwards' comment at the time of discharge may be construed to say, that Mrs. Garner was on its side.

### III

We have previously held on several occasions that a "serious harm" notice, such as that posted by the company in the instant case, does not constitute a violation of § 8(a) (1). See, e. g., N.L.R.B. v. Kayser-Roth Hosiery Co., 388 F.2d 979 (4 Cir. 1968); Wellington Mill Division v. N.L.R.B., 330 F. 2d 579, cert. den., 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964). While we agree that such a notice "may take a different coloration by virtue of accompanying circumstances," and may "take on a darker hue when viewed in the perspective of the particular setting," Amalgamated Clothing Workers v. N.L.R.B., 365 F.2d 898, 910 (D.C.Cir.1966); see also, J. P. Stevens & Co. v. N.L.R.B., 380 F.2d 292, 302–303 (2 Cir. 1967), we do not find that the circumstances here, which involve only isolated § 8(a) (1) violations, prohibited the company from engaging in the type of activity which we have held § 8(c) is designed to protect. We decline enforcement of the portion of the order directed to the "serious harm" notice.

Enforcement granted in part and denied in part.

---

**3.** It is also to be noted that Mrs. Garner did not contend that she wore a union button, as did other employees who supported the union.