**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NU–SOUTHERN DYEING & FINISHING, INC., and Henderson Combining Co., Respondents.**

**No. 14960.**

United States Court of Appeals, Fourth Circuit.

Argued April 5, 1971.

Decided May 28, 1971.

Albert V. Bryan, Circuit Judge, concurred in part and dissented in part and filed opinion.

Paul J. Spielberg, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Marjorie S. Gofreed, Atty., N. L. R. B., on brief), for petitioner.

Ernest W. Machen, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for respondents.

Before BRYAN, WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

Nu-Southern Dyeing & Finishing, Inc. and Henderson Combining Co., previously determined to be a single employer and hereafter called the "company," were found by the Board to have violated §§ 8(a) (1) and 8(a) (5) of the National Labor Relations Act. 29 U.S.C.A. §§ 158(a) (1) and 158(a) (5). The Board's order (179 NLRB No. 96) required the company to cease and desist from threatening employees with discrimination because of their union activities and from refusing to bargain in good faith with the union,[1] to post the customary notices, and to bargain collectively with the union upon request. Enforcement of the order is now sought.

While we enforce the order as it pertains to the § 8(a) (1) violations, we find that the Board's conclusion that the company violated § 8(a) (5) of the Act when it withdrew recognition from the union is not supported by substantial evidence on the record as a whole. Consequently, we decline to enforce that part of the order requiring the company to bargain collectively with the union.

I

The bargaining unit presently consists of approximately 140 employees engaged in dyeing and finishing textile products at the company's plant in Henderson, North Carolina. In January, 1967, the union won a Board-conducted election at the plant by a narrow margin.[2] The union was certified in February, 1967; and on November 16 of that year, a one-year collective bargaining contract was executed. By its terms the contract was to be renewed automatically at the end of the year unless either party gave notice of termination 60 days prior to its expiration.

Union activity during the contract year was at an extremely low level. Only two grievances were processed, both of which were settled favorably to the employee. Only two employees ever attended union meetings; only five or six employees paid dues. Early in the contract year the union posted lists of employees to serve as shop stewards and committeemen. The union failed to fill all positions. Many of the names on these lists were crossed out in pencil, as were the names written in as replacements. The lists disappeared within four or five weeks, and no new lists were ever posted. The company experienced continuous difficulty in ascertaining who was authorized to act for the union in such matters as safety.

Early in September of 1968, union representative Moore, making only his second visit to the plant, met with company president Baldecchi and informed him that the union wished to terminate the existing contract and negotiate a new one. At this meeting, Baldecchi said that he wished the union would leave him alone, that he treated his employees fairly, and that he did not understand why the union bothered with such a small company. In response to Moore's request to begin negotiations at once, Baldecchi responded that it was "just too early even to discuss the thing." Thereafter, both parties gave formal written notice of the termination

1. Glass Bottle Blowers Association of the United States and Canada, AFL–CIO.

2. At that time there were 93 eligible votes. Of the valid votes cast, 47 votes were cast for the union, and 41 against.

of the contract, the company on September 13 and the union on September 16.

Soon after this meeting with Moore, Baldecchi had a conversation with employee Rice, a union member, about the union situation. Rice's testimony, credited by the trial examiner, was that Baldecchi asked "why did I fool around with anything like that; he said, at my age I should think about my security." Apparently this was an isolated incident; there is no evidence of other such conversations.

The Board's decision and order are based principally on events occurring at a meeting of the employees held on September 24. This was a regularly scheduled safety meeting presided over by personnel manager Morris. The meeting lasted only 30 minutes, and it is undisputed that most of the meeting dealt with matters of safety. However, in the last few minutes, Morris brought up the union problem. He stated that he had been approached by several employees who wanted to disassociate themselves from the union and who wanted to know how this could be accomplished. He said that the way to proceed was to circulate an anti-union petition, but that it could not be done on company time or company property. He stated that, in any event, the employees were free to do as they pleased. The trial examiner, whose recommended decision was adopted by the Board, cited Morris' own testimony as to one last comment:

Well, I said in regards to that that previously I was a rank and file employee with the Company for 11 and ½ years and I never had to pay a third party and if I did pay a third party, I would certainly want some representation, and I hadn't seen any representation in this plant during the contract.

Early in October, the company was presented with a petition signed by 86 employees which stated that union representation was no longer desired.[3] There was no evidence that any company supervisor participated in the preparation of the petition or in obtaining signatures to it. On October 8, president Baldecchi wrote to Moore and stated that negotiations for the new contract would not be undertaken, because the company had reason to believe that the union no longer enjoyed the support of a majority of its employees. The unfair labor practice charges which resulted in the present decision and order were filed approximately three weeks later.

## II

■■ The Board found that Baldecchi's remarks to employee Rice early in September constituted a threat of reprisals because of Rice's union activity in violation of § 8(a) (1) of the Act. The Board credited Rice's testimony over the denial of Baldecchi, and we are bound by such credibility resolutions. Benson Veneer Company v. N. L. R. B., 398 F.2d 998 (4 Cir. 1968). Given Rice's version of the conversation, the Board's conclusion has substantial evidentiary support.

The other § 8(a) (1) violation found by the Board arose from Morris' remarks at the safety meeting about the union situation. As expressed by the trial examiner, the Board found the violation in Morris' comment about paying union dues without receiving noticeable representation:

Coming at the very moment the personnel director was advising the assembled employees of the technique of a petition to remove the Union from the plant, they [these words] constituted as much a clear message that it was the company's desire that they circulate such a petition and sign it. It was for all practical purpose Morris

---

3. A pro-union petition, signed by 61 employees, 17 of whom had signed the anti-union petition, was circulated soon after the anti-union petition. However, this petition was kept secret and never shown to the company, so that it could have had no effect on the company's good faith in withdrawing recognition from the union.

urging the employees to take this action to reject collective bargaining.

Section 8(c) of the Act reserves to management a right to express opposition to the unionization of its employees. 29 U.S.C.A. § 158(c). "[T]he employer is free to make any statement of opinion concerning the union which contains no threats or promise of benefit." Holly Hill Lumber Company v. N. L. R. B., 380 F.2d 838, 841 (4 Cir. 1967). Thus, we have consistently held that "serious harm" notices posted during organizational campaigns are protected speech, absent special circumstances. J. P. Stevens & Co. v. N. L. R. B., 406 F.2d 1017 (4 Cir. 1968); N. L. R. B. v. Greensboro Hosiery Mills, Inc., 398 F.2d 414 (4 Cir. 1968); N. L. R. B. v. Kayser-Roth Hosiery Co., 388 F.2d 979 (4 Cir. 1968); Wellington Mill Division, West Point Mfg. Co., v. N. L. R. B., 330 F.2d 579 (4 Cir. 1964), cert. den., 379 U.S. 882, 85 S.Ct. 144, 13 L. Ed.2d 88 (1964); N. L. R. B. v. Threads, Inc., 308 F.2d 1 (4 Cir. 1962). However, "[t]he difference between permitted and coercive language often lies in an analysis of the 'total background of facts and circumstances.'" Corrie Corporation of Charleston v. N. L. R. B., 375 F.2d 149, 153 (4 Cir. 1967). Applying this standard, Morris' statement, while a violation of § 8(a) (1), can hardly be considered a grave violation of § 8(a) (1). Not only was it an opinion based on his own personal experience, but the record shows that it did not grossly misstate the level of union activity in the plant during the contract year. We, nevertheless, agree that Morris' comment could be understood to express the anti-union position of the company, and, juxtaposed to his advice concerning the anti-union petition, it is not unreasonable to infer that the employees were made to believe that the company would welcome the expulsion of this "third party." Coming as it did when the existing collective bargaining contract was about to expire, we conclude that the Board could find that the comment presented "a reasonable tendency in the totality of the circumstances to intimidate." Corrie Corporation of Charleston v. N. L. R. B., 375 F.2d 149, 153 (4 Cir. 1967).

### III

The finding of a § 8(a) (5) violation and the issuance of the bargaining order stem directly from the Board's conclusion, articulated by the trial examiner, that Morris' comment at the safety meeting was unlawfully coercive: "With this—an unfair labor practice—the genesis of the petition, the Respondent's later reliance upon it as a basis for its refusal to bargain further with the Union emerges as an act taken in bad faith." Absent this petition, the Board found wanting a sufficient basis on which the company could justify withdrawal of recognition from the union. We conclude that the Board's refusal to attribute any significance to the anti-union petition was error, and consequently the record does not support the finding of a § 8(a) (5) violation.

The law is settled that during the first year following certification a union is entitled to an irrebuttable presumption of majority support. After this certification year, however, the presumption may be overcome by proof that the union no longer enjoys such support or that the company reasonably has a good faith doubt of such support. Brooks v. N. L. R. B., 348 U.S. 96, 75 S. Ct. 176, 99 L.Ed. 125 (1954); Terrell Machine Co. v. N. L. R. B., 427 F.2d 1088 (4 Cir. 1970).

Here, the Board's decision that the company could not rely in good faith on the anti-union petition is based on the principle that "an employer may not avoid the duty to bargain by demonstrating a loss of majority status arising from its own unfair labor practices." N. L. R. B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091, n. 4 (8 Cir. 1969). While this is a correct statement of the law, the existence of § 8(a) (1) violations prior to the refusal to bargain does not necessarily mean that an em-

**16**

ployer's action is in bad faith. An employer may avoid a bargaining order by showing that the unfair labor practices did not significantly contribute to such a loss of majority or to the factors upon which a doubt of such a majority is based. Fremont Newspapers, Inc. v. N. L. R. B., 436 F.2d 665 (8 Cir. 1970); Ingress-Plastene, Inc. v. N. L. R. B., 430 F.2d 542 (7 Cir. 1970).

■ On the record before us, we think the company has presented ample evidence to show the lack of a significant causal relation between the § 8(a) (1) violations found by the Board and the anti-union petition.[4] A finding that Morris' comment at the safety meeting was a violation of § 8(a) (1) does not, on this record, support a finding that the comment was "the genesis of the petition." As we have said: *"The test is not whether the language or acts were coercive in actual fact,* but whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate." Corrie Corporation of Charleston v. N. L. R. B., 375 F. 2d at 153. As has been noted, Morris' comment was no more than a technical violation of § 8(a) (1). Prior to the statement in question, Morris was specific in telling the employees that the ultimate decision concerning the petition was their own and that under no circumstances was company time or property to be involved. At the same time, the evidence indicating that the petition was the product of the employees' free will was substantial. Until the two incidents at the end of the contract year, which the Board found to be § 8(a) (1) violations, the company's relations with the union had been harmonious and uneventful. Despite this fact, only two employees attended meetings, five or six paid dues, and it was practically impossible to get anyone to hold union offices in the plant. Additionally, it is not disputed that numerous employees ex-

pressed to company supervisors a desire to disassociate themselves from the union. In fact, it was only in response to employee inquiries that the subject of the union and the petition arose at the safety meeting. The election had been extremely close, and the trial examiner found that during the contract year employee turnover exceeded 50%. Under these circumstances, Morris' single comment about the "third party" appears insignificant, and thus the company's reliance on the petition was justified.

Viewing the combined effect of the anti-union petition and the indications of employee disaffection with the union just mentioned, we conclude that the company established that it possessed a good faith doubt of the union's majority status at the time of the refusal to bargain. The Board's contrary finding is not supported by substantial evidence and its bargaining order is not entitled to enforcement.

Enforced in part; vacated in part.

ALBERT V. BRYAN, Circuit Judge (concurring in part and dissenting in part):

I concur in all of the majority's opinion except so much of it as holds the remark of Morris to be a § 8(a) (1) violation. To me the Court strains reason to reach this result. I cannot join in the attenuation and, indeed, the Court itself seems to have the same difficulty with the refinement.

After recognizing that the employer has "a right to express opposition to the unionization of its employees", the Court continues: "Applying this standard, Morris' statement, while a violation of § 8(a) (1), can hardly be considered a grave violation of § 8(a) (1). Not only was it an opinion based on his own personal experience, but the record shows that it did not grossly misstate the level

4. Concerning Baldecchi's conversation with employee Rice, we need only note that Rice did not sign the anti-union petition, and there is no evidence that Rice related the incident to any other employees. See, *e. g.,* Ingress-Plastene, Inc. v. NLRB, *supra.*

of union activity in the plant during the contract year."

Notwithstanding, the Court now convicts the employer because of Morris' observation. I cannot agree to such a judgment.