**PITTSBURGH AND NEW ENGLAND TRUCKING CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1501.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1981.

Decided March 3, 1981.

---

Roger S. Kaplan, New York City (Steven S. Goodman, Jackson, Lewis, Schnitzler & Krupman, New York City, on brief), for petitioner.

Michael R. White, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, W. Christian Schumann, Washington, D. C., on brief), for respondent.

Before RUSSELL, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Antecedents to the present case are to be found in *Pittsburgh & New England Trucking Co. v. NLRB*, 4th Cir., No. 78–1781 (December 4, 1979, unpublished decision.) We there granted enforcement to portions of an NLRB ruling which held violative of § 8(a)(1) of the National Labor Relations Act:[1] (i) a letter to strikers of August 31, 1976 (as reinforced by explanations of the letter's intent made by the employer's attorney in December 1, and December 7, 1976 bargaining sessions) informing them that, after their return to work, those who had replaced them could have seniority superior to theirs and (ii) a letter of October 29, 1976 threatening employees with assertions that their right to recall would be prejudiced if they did not abandon the strike and return to work.

The opinion of December 4, 1979, denied enforcement, however, of NLRB findings that there had been additional unfair labor practices which acted to cause or to prolong the strike, thereby converting it from an economic to an unfair labor practices strike.

The strike ended with a letter of November 29, 1976 from the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Steelhaulers Local 800 ("Union"), the bargaining representative for the 13 striking employees,[2] requesting immediate, unconditional reinstatement for all of them. As vacancies in the work force developed, three reinstatements occurred on November 30, 1976, January 3, 1977 and February 28, 1977, respectively.

Until May of 1977, collective bargaining proceeded between the Company and the Union. On May 3, 1977, the Union filed an unfair labor practice charge claiming refusal by the Company to bargain in good faith, beginning December 3, 1976. On May 9, 1977, 17 employees (out of 29 comprising

---

1. 29 U.S.C. § 158(a)(1).

2. Six members of the unit continued to work during the strike.

the unit) presented to the Company a petition stating that "Teamsters Local 800 no longer represents us." They were informed that such a petition should be filed with the NLRB, and on May 16, 1977, a principal actor among the employees, Claire Sadler, filed a decertification petition.

On May 17, 1977, in the final meeting of the Company and the Union, the Company referred to the filing of the decertification petition, expressed a belief that the Union no longer represented a majority of the employees, announced suspension of negotiations, and withdrew all outstanding proposals. The Union, during the meeting of May 17, 1977, sought to accept the Company's theretofore pending contract proposal "word to word from front to back."[3]

Although the charge of refusal to bargain in good faith had been made on May 3, 1977, it took the NLRB Regional Director until December 21, 1978, well over one and one-half years, to issue a complaint.[4]

The unfair labor practices which, in the view of the NLRB, tainted the Company's behavior and required it to leave outstanding any extant collective bargaining proposal were the violations of § 8(a)(1) found to exist in the earlier case decided by us on December 4, 1979. They occurred on August 31, 1976, October 29, 1976, December 1, 1976, and December 7, 1976. The last, in point of time, therefore, antedated the revocation of the offer on May 17, 1977 by more than five months.

The NLRB adduced no evidence to show an actual cause and effect relationship between (a) the 1976 threats to striking employees' seniority and to striking employees' recall rights and (b) the disaffection from the Union. Rather the NLRB conclusion rested solely on the supposed inherent tendency the proscribed activities might be presumed to have to induce a lessened esteem for the Union among employees in the bargaining unit.

It is not necessary for us to determine whether such an assumption standing alone would suffice for the purposes to which it was put by the NLRB if there had been absolutely no additional offer of evidence one way or the other. "An employer may avoid a bargaining order by showing that the unfair labor practices did not significantly contribute to such a loss of majority or to the factors upon which a doubt of such a majority is based." *NLRB v. Nu-Southern Dyeing & Finishing, Inc.*, 444 F.2d 11, 16 (4th Cir. 1971). Here the Company sought to make just such a showing by calling as a witness an employee in the bargaining unit instrumental in preparation

---

**3.** There was no resolution by the NLRB of the question of time sequence between the two statements. It appears almost inevitable, however, simply from a consideration of the order which the two statements would almost surely take in the normal course of events, that the Company withdrew its proposal before the Union sought to accept it. At any rate, in the absence of a finding by the NLRB that the Union spoke first, there is simply no way in which we can conclude that a binding contract had been entered between the parties.

The NLRB has reinforced that conclusion in leaving undecided the question of who spoke first, and asserting that any attempt of the Company to withdraw its offer was barred by reason of unfair labor practices. *See NLRB v. Nu-Southern Dyeing & Finishing, Inc.*, 444 F.2d 11, 15 (4th Cir. 1971) (" 'An employer may not avoid the duty to bargain by demonstrating a loss of majority status arising from its own unfair labor practices.' ") The May 27, 1980 order in this case (to which has been assigned the number 249 NLRB No. 104) directed the Company to cease and desist from conduct determined to violate § 8(a)(1) and § 8(a)(5) of the Act. We have concluded that the reason advanced why the Company could not withdraw its proposal is insufficient or fallacious. Even so, the choice of the alternative route by the NLRB suggests a recognition by it that it was unable to conclude that the Union accepted before the Company withdrew.

**4.** The Company has argued that the unfair labor practices charge of May 3, 1977 could not encompass a matter that did not even occur until May 17, 1977, two weeks after the charge was filed. It particularly relies on a Stipulation entered between the General Counsel of the NLRB, the Union and the Company that there was no contention by the General Counsel that the Company had failed to bargain in good faith "during the certification year or prior to May 17, 1977." The result we have reached makes it unnecessary for us to address the point. *See NLRB v. Fant Milling Co.*, 360 U.S. 301, 307–09, 79 S.Ct. 1179, 1183, 3 L.Ed.2d 1243 (1959).

of the petition seeking to terminate representation by the Union. She would have testified that the 1976 unfair labor practices did not affect her or other signers. She would have stated that nothing had interfered with them nor had the Company interfered, or discriminated, against them in any way.

The NLRB declined to receive the proffered testimony, on the grounds that "subjective evidence" should not be admitted. Yet to bar evidence as to the state of mind of a witness when the issue itself is whether her state of mind towards the Union had been influenced was to deny the Company the most direct proof available on the controverted issue.[5]

We need not speculate as to the result which would have been reached if the petition organizer's testimony had been admitted, yet, in the context of the case as a whole, entirely discounted by the ALJ. Credibility is customarily for the finder of fact. It suffices that directly relevant primary evidence was entirely excluded. It might well have been persuasive enough to lead to a contrary result from the one reached. The ALJ, as factfinder, having heard the testimony might very well have concluded that a causal connection between the unfair labor practices and the Union disaffection was lacking.

In view of that distinct possibility, we decline to enforce an NLRB order, resting as it does on a faulty base.[6]

*ENFORCEMENT DENIED.*

---

**5.** The NLRB relies on a statement from *NLRB v. Gissel Packing Co., Inc.,* 395 U.S. 575, 608, 89 S.Ct. 1918, 1937, 23 L.Ed.2d 547 (1969):

We also accept the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of § 8(a)(1). We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry.

That statement, however, does not concern the relevance or the admissibility of evidence.

Rather it simply indicates an absence of a duty imposed on an ALJ or on an agency affirmatively to seek out the evidence referred to. It also suggests a reason for discounting the weight to be accorded the evidence once it has been received.

**6.** In view of our disposition, we have no occasion to consider whether, had the purported acceptance by the Union preceded any valid revocation of the Company's latest offer, the documents and surrounding circumstances would have amounted to an enforceable contract.