917 F.2d 22
 135 L.R.R.M. (BNA) 2872
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
CHESAPEAKE PLYWOOD, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 89-2981.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 6, 1990.
Decided Oct. 26, 1990.
 
 On Petition for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board. (5-CA-17436, 5-CA-17769, 5-CA-17823, 5-CA-17931, 5-CA-18143)
 Abram William VanderMeer, Jr., Hunton & Williams, Norfolk, Va, (Argued), for petitioner; Kelly O. Stokes, Hunton & Williams, Norfolk, Va, Paul M. Thompson, Hunton & Williams, Richmond, Va, on brief.
 Richard A. Cohen, National Labor Relations Board, Washington, D.C., (Argued), for Respondent; Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Howard E. Perlstein, Supervising Attorney, National Labor Relations Board, Washington, D.C., on brief.
 NLRB
 ENFORCEMENT GRANTED IN PART AND DENIED IN PART.
 Before WIDENER, K.K. HALL and WILKINS, Circuit Judges.
 WILKINS, Circuit Judge:
 
 
 1
 Chesapeake Plywood, Inc. petitions for review of the order of the National Labor Relations Board finding that Chesapeake committed several unfair labor practices. The Board cross-petitions for enforcement of its order. Enforcement is granted in part and denied in part.
 
 I.
 A.
 
 2
 Chesapeake Plywood, Inc., successor to Chesapeake Bay Plywood Corporation, operates a plywood manufacturing facility in Pocomoke City, Maryland. A Title VII action brought by the International Woodworkers of America (Union) against Chesapeake Bay Plywood Corporation was settled by an agreement (EEO Settlement Agreement) reached in 1982. The EEO Settlement Agreement provided, in part, that "the Labor Agreement that succeeds the Labor Agreement effective from June 19, 1979 through June 18, 1982 between Chesapeake Bay Plywood Corporation and Woodworkers" would contain specific language regarding a variety of matters. Pertinent to this litigation, section 20 of the EEO Settlement Agreement provided:
 
 
 3
 Unless an earlier date is provided elsewhere in this Agreement, sections 7 through 12 of the Agreement shall cease to have any force or effect upon expiration of five years from the date of the Agreement. Prior to that time, the terms of sections 7, 8, 10, 11 and 12 can be changed by agreement of the Company and the Union.[1]
 
 
 4
 The Labor Agreement dated June 18, 1982, contained the language required by the EEO Settlement Agreement. It expired June 18, 1985, approximately two years before the expiration of sections 7-12 as provided by the EEO Settlement Agreement.
 
 
 5
 Because the Pocomoke facility had consistently incurred losses, Chesapeake determined in 1984 that it was necessary to increase productivity and efficiency by establishing a longer probationary period for new workers, expanding employment sources, and establishing a new training program. Because implementation of these changes required Union concurrence, Chesapeake requested that the Union open mid-term negotiations. The Union rejected Chesapeake's proposals and refused to open negotiations.
 
 
 6
 On April 9, 1985, Chesapeake and the Union began negotiating a new contract to replace the Labor Agreement that would expire on June 18, 1985. After numerous bargaining sessions with no agreement, a deadlock resulted on July 19, 1985. Chesapeake's final offer for a two-year contract included the establishment of job and departmental seniority, revisions in the qualifications for entry-level positions in the maintenance department, modification of the training program for the maintenance department, changes in the method for filling maintenance department openings and for promotions within the maintenance department, allowing workers to find their own replacements for weekend overtime work, a wage freeze for most job classifications, a $500 ratification bonus, and a wage reopener clause for the second year of the contract. Several of these proposals conflicted with sections 7-12 of the EEO Settlement Agreement. On July 22, 1985, Chesapeake informed the Union that the ratification bonus and wage reopener provision were conditioned on Union acceptance by midnight of July 23. The Union did not accept Chesapeake's offer and began a strike at midnight on July 23, 1985.
 
 
 7
 By letter to the local Union president dated July 30, 1985, Chesapeake invited the Union employees to return to work but indicated that the terms of the expired Labor Agreement providing that all employees were required to be Union members and providing for a Union dues checkoff would no longer be in effect.
 
 
 8
 The strike continued and Chesapeake and the Union did not meet again until September 18, 1985. At this meeting a Union negotiator stated that the Union had been forced to strike because the new maintenance department training program proposed by Chesapeake conflicted with the EEO Settlement Agreement. Chesapeake responded by withdrawing this proposal and agreed to "abide by [the EEO Settlement Agreement] in all respects." The Union nevertheless walked out of the meeting when Chesapeake refused to rescind its withdrawal of the $500 bonus and the wage reopener provision. At the Union's request the meeting was reconvened later that day and the Union offered to settle the strike on the terms offered by Chesapeake on July 19 without the maintenance department and weekend overtime proposals and with an increase in Chesapeake's medical insurance benefits contribution. This offer was conditioned on Chesapeake's immediate reinstatement of all striking employees. Chesapeake refused the Union's offer and made a counteroffer that withdrew all the maintenance department proposals and the weekend overtime proposal and offered to provide strikers "the reinstatement rights they are entitled to under the law." Chesapeake refused to agree to an increase in the medical benefits contribution but made a new three-year wage proposal to freeze wages for the first two years and increase them by two percent the third year. The meeting ended without a Union response. Although Chesapeake and the Union did communicate by letter, no further face-to-face negotiations were held.
 
 
 9
 From the inception of the strike until November 4, 1985, every striker who returned to work was reinstated to his pre-strike position and rate of pay with no loss in seniority. On November 4, Chesapeake created a preferential rehire list, and all strikers who requested to return to work after that date were placed on the rehire list and treated as economic strikers. In a letter dated December 29, 1985, the Union informed Chesapeake that the strike had ended and requested that Chesapeake unconditionally reinstate all strikers. Although Chesapeake refused, it did place all remaining strikers on the preferential rehire list with the exception of those discharged for strike misconduct.
 
 
 10
 At the Union's request, Chesapeake agreed to a March 17, 1986 meeting. However, on March 13, Chesapeake received a petition signed by 140 bargaining unit employees[2] stating that they no longer wished to be represented by the Union. Chesapeake cancelled the meeting and sent the Union a telegram informing it that Chesapeake had an "objectively based good faith doubt" about the Union's continued majority status. Chesapeake subsequently refused to respond to a Union request for information.
 
 
 11
 On May 22, 1986, Chesapeake sent a letter to all former employees who remained on the preferential rehire list requesting that they indicate whether they wished to remain on the list. The letter stated that a failure to respond by June 5, 1986, would result in removal of the employee's name from the preferential rehire list. On June 16, 1986, Chesapeake sent letters to eight former employees who had not responded to the May 22 letter and informed them that their names had been removed from the rehire list.
 
 B.
 
 12
 On the night the strike began, Herb Mossett, an employee who had decided not to strike, was approached in the parking lot of the Pocomoke facility by Ronald Hockett. Mossett later testified that Hockett said, "You don't plan on working do you?" When Mossett did not reply, Hockett stated, "I feel sorry for your damn house." Mossett elected not to work that night and reported the incident to Chesapeake's general manager that same evening. The general manager was also informed the next day that Hockett had thrown rocks at trucks belonging to a contractor performing work at the Pocomoke facility as the trucks crossed a picket line.
 
 C.
 
 13
 The unfair labor practice charges against Chesapeake were originally heard by an Administrative Law Judge. The ALJ found that Chesapeake violated sections 8(a)(5) and (1) of the National Labor Relations Act (Act), 29 U.S.C.A. Secs. 158(a)(5) and (1) (West 1973), by bargaining to impasse over a nonmandatory subject of collective bargaining--the modification of the EEO Settlement Agreement. The ALJ also found that bargaining to an impasse was a causal factor in the strike, thereby rendering it an unfair labor practice strike. The ALJ concluded that the strike did not lose its status as an unfair labor practice strike as a result of Chesapeake's September 18, 1985, offer to "abide by [the EEO Settlement Agreement] in all respects." Because he concluded that the strike was at all times an unfair labor practice strike, the ALJ found that Chesapeake violated sections 8(a)(3) and (1) of the Act, 29 U.S.C.A. Secs. 158(a)(3) and (1) (West 1973), by refusing, upon their offers to return to work, to reinstate employees who participated in the strike. The ALJ also found the following violations: (1) violation of sections 8(a)(5) and (1) by withdrawing its recognition of the Union and refusing to provide the Union with information; (2) violation of section 8(a)(1) by threatening to remove former strikers from the preferential rehire list if they failed to respond to Chesapeake's letter; (3) violation of sections 8(a)(3) and (1) by removing the names of eight former strikers from the rehire list because of failure to respond to the letter; and (4) violation of sections 8(a)(3) and (1) by discharging Jennis Collins on January 15, 1986, under conditions discouraging Union membership.[3] Additionally, the ALJ found that Chesapeake did not have sufficient evidence to conclude that Hockett was involved in the rock throwing incident. He concluded, however, that it was unnecessary to determine whether Hockett was actually involved because the threat to Mossett was an independent ground justifying termination. Thus, he found no violation resulting from the discharge of Hockett.
 
 
 14
 The Board affirmed the ALJ's decision except for the finding that Chesapeake did not violate sections 8(a)(3) and (1) by discharging Hockett. In this regard, it also considered an incident involving a nonstriker, Robert Hayman, who drove through a picket line with a shotgun in his lap. One of the strikers claimed that Hayman had pointed the gun at the picketers and threatened them. Hayman denied this allegation and contended that he carried the gun propped against the dashboard of his car as a warning to picketers not to harass him. Chesapeake did not discharge Hayman but issued a warning to him and placed a report of the incident in Hayman's personnel file. The Board concluded that the discharge of Hockett violated sections 8(a)(3) and (1) because of Chesapeake's disparate treatment of Hockett and Hayman.[4]
 
 II.
 
 15
 We review the Board's order to determine whether the Board correctly applied the law and whether its factual findings are supported by substantial evidence. See 29 U.S.C.A. Sec. 160(e) (West 1973). The Board's findings are to be accepted on review if they represent a " 'choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.' " NLRB v. Aerovox Corp., 435 F.2d 1208, 1209 (4th Cir.1970) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).
 
 
 16
 Section 8(a)(5) of the Act provides that it is an unfair labor practice "to refuse to bargain collectively" with the employees' representative. 29 U.S.C.A. Sec. 158(a)(5). However, section 8(d) of the Act makes bargaining mandatory only "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C.A. Sec. 158(d) (West Supp.1989). With respect to these mandatory subjects of bargaining, "neither party is legally obligated to yield." NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349 (1958). However, with regard to nonmandatory subjects of collective bargaining, a party is not permitted to bargain to an impasse. See Newport News Shipbuilding & Dry Dock Co. v. NLRB, 602 F.2d 73, 76 (4th Cir.1979) (impasse over nonmandatory subjects of bargaining construed as a refusal to bargain in violation of section 8(a)(5)).
 
 A.
 
 17
 Of primary importance is whether Chesapeake's proposals to modify the EEO Settlement Agreement were mandatory rather than nonmandatory subjects of collective bargaining. While it is true that absent the EEO Settlement Agreement the proposals would have concerned mandatory subjects of collective bargaining, the issue is whether the existence of the EEO Settlement Agreement transformed the proposals from mandatory to nonmandatory subjects of collective bargaining.
 
 
 18
 Chesapeake unpersuasively argues that the provision in the EEO Settlement Agreement allowing modification of sections 7, 8, 10, 11, and 12 by agreement of the Union and Chesapeake indicates that the parties intended that proposed changes to those provisions be relegated to the collective bargaining process. The EEO Settlement Agreement provided that the relevant sections were to be in effect for five years unless modified. It also provided that its terms were to be incorporated into the next Labor Agreement. Both logic and the plain language of the EEO Settlement Agreement compel the conclusion that the provisions that were subject to possible modification were not relegated to the collective bargaining process. Had the parties intended these provisions to be subject to collective bargaining, the EEO Settlement Agreement would have provided that the provisions were to expire simultaneously with the Labor Agreement rather than on the later date specified in the EEO Settlement Agreement.[5]
 
 
 19
 In support of its position that the terms of the EEO Settlement Agreement were mandatory subjects of collective bargaining, Chesapeake attempts to draw an analogy between the modification provision and clauses in collective bargaining agreements providing for reopening of negotiations. See NLRB v. Lion Oil Co., 352 U.S. 282 (1957). In Lion Oil, the Supreme Court held that where a collective bargaining agreement provided for mid-term modification, either party could use "economic weapons ... to support demands for modification," thus indicating that such a modification was a mandatory rather than nonmandatory subject of collective bargaining. Id. at 294. However, in Lion Oil, the agreement provided a mechanism for modification and for termination by either party if a modification agreement was not reached. Id. at 286. Here, the EEO Settlement Agreement did not provide that either party could terminate the agreement and it provided for modification only "by agreement of the Company and the Union."
 
 
 20
 To allow Chesapeake to bargain to impasse over its proposed changes to the EEO Settlement Agreement would effectively allow Chesapeake to unilaterally implement a change that required mutual consent. See Excavation-Construction, Inc. v. NLRB, 660 F.2d 1015, 1023 n. 4 (4th Cir.1981) (after impasse an employer is free to unilaterally implement changes in employment terms). Because the EEO Settlement Agreement expressly provided that modification could only be made "by agreement of the Company and the Union," Chesapeake violated sections 8(a)(5) and (1) by bargaining to impasse over these issues.
 
 B.
 
 21
 Chesapeake also contends that substantial evidence does not support the Board's finding that its proposals that conflicted with the EEO Settlement Agreement contributed to the impasse. It argues that the evidence demonstrates that the impasse and strike resulted only from disagreement over economic issues.
 
 
 22
 "If an unfair labor practice is a 'contributing cause' of a strike, then as a matter of law, the strike must be considered as an unfair labor practice strike." NLRB v. Colonial Haven Nursing Home, Inc., 542 F.2d 691, 704 (7th Cir.1976). Additionally, "the insistence upon the non-mandatory proposal need not be the sole cause of the parties' failure to reach agreement" for a court to find that an impasse was reached over nonmandatory subjects. Latrobe Steel Co. v. NLRB, 630 F.2d 171, 180 (3d Cir.1980), cert. denied, 454 U.S. 821 (1981). The record demonstrates that the determination by the Board that Chesapeake bargained to impasse over nonmandatory subjects of collective bargaining and that this impasse contributed to the strike is supported by substantial evidence. Thus, we enforce that portion of the order finding that Chesapeake committed an unfair labor practice in violation of sections 8(a)(5) and (1) by bargaining to impasse over nonmandatory subjects of collective bargaining.
 
 III.
 
 23
 Because we conclude that Chesapeake committed an unfair labor practice we agree with the Board that, at least initially, the strike was an unfair labor practice strike. See Northern Wire Corp v. NLRB, 887 F.2d 1313, 1319 (7th Cir.1989) ("A strike that is caused in whole or in part by an employer's unfair labor practices is an unfair labor practice strike.") (emphasis in original); General Drivers and Helpers Union, Local 662 v. NLRB, 302 F.2d 908, 911 (D.C.Cir.) ("[I]f an unfair labor practice had anything to do with causing the strike, it was an unfair labor practice strike."), cert. denied, 371 U.S. 827 (1962); see also NLRB v. Stilley Plywood Co., 199 F.2d 319, 320-21 (4th Cir.1952), cert. denied, 344 U.S. 933 (1953). Chesapeake contends, however, that even if the strike was initially an unfair labor practice strike, after it withdrew the proposals that conflicted with the EEO Settlement Agreement at the September 18, 1985 meeting, the strike continued only over mandatory subjects of bargaining and thus became an economic one. Chesapeake reasons that once the strike became an economic one, it was not required to reinstate the employees who continued to strike. See Colonial Haven Nursing Home, 542 F.2d at 703 (if strikers "subsequently lost ... the status of unfair labor practice strikers, the basic ground for the Board's reinstatement and backpay order would evaporate").
 
 
 24
 Chesapeake contends that notes taken by a Union representative reflect that at the outset of the September 18 meeting, Chesapeake agreed to "abide by [the EEO Settlement Agreement] in all respects." The ALJ disagreed with this contention and found that Chesapeake's September 18 offer left intact the proposal to eliminate a disqualified employee's right to return to his former position after promotion. The ALJ based this conclusion on section 11 of the EEO Settlement Agreement:
 
 
 25
 Following a promotion, employees will be allowed to disqualify themselves during the trial and training period. Employees who are disqualified on their own initiative or by the Company will be reinstated to their former positions.
 
 
 26
 As required by the EEO Settlement Agreement, this "safety net" provision was included in the 1982 Labor Agreement. Chesapeake's proposal for the new Labor Agreement that the ALJ found to conflict with section 11 provided:
 
 
 27
 Employees who are promoted or transferred on a permanent basis to a new job classification will be allowed ten (10) work days during a trial and training period to disqualify themselves and the Company will be given thirty (30) work days to disqualify the employee for not having the ability to do the work on a normal production basis.
 
 
 28
 From Chesapeake's proposal the ALJ apparently concluded that a disqualified employee would lose his right to return to his former position. We do not agree. Chesapeake's proposal only specified the length of the "trial and training" period and did not eliminate the right to return to the employee's former position. It was implicit in the proposal that an employee retained a right to return to his former position, for no employee would disqualify himself within the 10-day period if the result would be the termination of his employment. Thus, we conclude that Chesapeake's proposal did not conflict with Article 11 of the EEO Settlement Agreement.[6]
 
 
 29
 The ALJ found that other than the disqualification proposal, Chesapeake's September 18 offer "did not conflict en haec verba with the EEO [Agreement]." However, the ALJ concluded that the remaining proposals to eliminate plant seniority, establish lines of progression, allow an eight-year employment preference, impose a two-year employment requirement for bidding into new lines of progression, and shorten the time period for qualifying in a higher rated position "effectively undermined the EEO [Agreement] by supplanting existing seniority criteria with an entirely distinct system of preferences for advancement, transfer and the filling of vacancies generally." The Board agreed with this reasoning and held that the September 18 offer did not alter the nature of the strike. It argues that this conclusion is correct because although the EEO Settlement Agreement referred only to "seniority," the only seniority system in effect at the time of the EEO Settlement Agreement was plant-wide seniority. The Board reasons that to change to a job and departmental seniority system as proposed by Chesapeake would "effectively undermine[]" the EEO Settlement Agreement. However, the Board points to no evidence to support this theory and our review does not reveal any evidence that job and departmental seniority is more discriminatory than plant-wide seniority and would thus undermine the EEO Settlement Agreement.
 
 
 30
 Because Chesapeake withdrew all of the proposals that were in conflict with the EEO Settlement Agreement and agreed to "abide by [the EEO Settlement Agreement] in all respects," we conclude that substantial evidence does not support the Board's finding that the September 18 offer did not alter the nature of the strike. Following the September 18 meeting, Chesapeake's only remaining proposals dealt with mandatory subjects of collective bargaining. Thus, we hold that after September 18, 1985, the strike became an economic strike rather than an unfair labor practice strike.
 
 
 31
 The Board's conclusion that at all times the strike was an unfair labor practice strike was necessary to support its finding that Chesapeake violated sections 8(a)(3) and (1) by denying reinstatement to strikers after November 4, 1985, the date Chesapeake's offer to reinstate strikers expired. Because the strike became an economic one after September 18, Chesapeake was not required to reinstate strikers who continued to strike after that date. See Colonial Haven Nursing Home, 542 F.2d at 703. Thus, we deny enforcement of the Board's order to reinstate the strikers who had not returned to work prior to November 4, 1985.
 
 IV.
 
 32
 The Board found that Chesapeake's withdrawal of recognition of the Union and its refusal to provide the Union with requested information violated sections 8(a)(5) and (1). The Board reasoned that Chesapeake's unfair labor practices foreclosed any claim that Chesapeake had an "objectively based good faith doubt" of majority support for the Union.
 
 
 33
 The presumption of a Union's majority status may be overcome by a showing of a "reasonably grounded good faith doubt of majority support." Terrell Mach. Co. v. NLRB, 427 F.2d 1088, 1090 (4th Cir.), cert. denied, 398 U.S. 929 (1970). However, an employer may not rely on " 'a loss of majority status arising from its own unfair labor practices.' " NLRB v. Nu-Southern Dyeing & Finishing, Inc., 444 F.2d 11, 15 (4th Cir.1971) (quoting NLRB v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 n. 4 (8th Cir.1969)). The unfair labor practices, however, must have been sufficiently serious to contribute to the loss of majority status. BASF Wyandotte Corp., 276 N.L.R.B. 1576, 1577 (1985); Nu-Southern Dyeing, 444 F.2d at 16 (employer may "show[] that the unfair labor practices did not significantly contribute to such a loss of majority").
 
 
 34
 Here, the Board found that the unfair labor practices of bargaining to impasse over nonmandatory subjects, failing to reinstate the strikers, and discharging a former striker who had not engaged in misconduct significantly contributed to the loss of majority status. The Board and the ALJ relied heavily on the fact that Chesapeake did not reinstate the former strikers who offered to return after November 4, 1985. The ALJ concluded that Chesapeake's "bargaining strategy set in motion a chain of events whose ultimate consequence was loss of majority." However, because we hold that Chesapeake was not required to reinstate the strikers after September 18, 1985,[7] the only unfair labor practice occurring after that date was the discharge of Jennis Collins. The primary basis for the Board's finding that the petition of the bargaining unit employees was tainted by Chesapeake's unfair labor practices is eliminated by our holding that the strike became economic after September 18, 1985. Additionally, the Board does not contend that Chesapeake was involved in the initiation, preparation, or distribution of the petition. The petition was signed by a majority of the bargaining unit employees calculated by including the strikers who had not been reinstated and the strikers who had been discharged for strike misconduct. Thus, we find that there was not substantial evidence to support the Board's conclusion that Chesapeake did not have a reasonably grounded good faith doubt as to the Union's majority status.
 
 
 35
 Because Chesapeake's duty to provide information arises solely from the Union's need for the information to fulfill its duties as representative, Chesapeake's good faith doubt about majority status is also a defense to this. See NLRB v. Whitin Mach. Works, 217 F.2d 593, 594 (4th Cir.1954) (employer required to furnish information that "is necessary to the proper discharge of the duties of the bargaining agent"), cert. denied, 349 U.S. 905 (1955). Thus, we deny enforcement of that portion of the Board's order finding that Chesapeake violated sections 8(a)(5) and (1) by withdrawing its recognition of the Union and refusing to provide the Union with requested information.
 
 V.
 
 36
 Chesapeake also challenges the Board's conclusions that the May 22, 1986 letter to those on the rehire list violated section 8(a)(1) and that removing eight strikers from the rehire list because they failed to respond to the letter violated section 8(a)(3) and (1). The Board concluded that because the strike was an unfair labor practice strike, Chesapeake could not threaten to terminate former strikers for failing to respond. It found that the strikers were entitled to reinstatement upon their offer to return to work and Chesapeake could do nothing to diminish that right. However, our conclusion that the strike became an economic strike after September 18, 1985 forecloses the result reached by the Board. Moreover, we agree with the Seventh Circuit that the burden of notifying an employer that one wishes to stay on a rehire list is insubstantial and "does not discourage employees from exercising their rights, does not greatly interfere with those rights, and is not discriminatory." Giddings & Lewis, Inc. v. NLRB, 710 F.2d 1280, 1287 (7th Cir.1983). We deny enforcement of that portion of the Board's order regarding the May 22, 1986 letter and Chesapeake's termination of the strikers who failed to respond.
 
 VI.
 
 37
 Finally, Chesapeake challenges the Board's determination that its discharge of Hockett violated sections 8(a)(3) and (1). The Board found that Chesapeake discriminated against Hockett because it treated him more severely than Hayman whom the Board concluded was guilty of more serious misconduct. See Garrett R.R. Car & Equip., Inc. v. NLRB, 683 F.2d 731, 740 (3d Cir.1982) (employer guilty of an unfair labor practice when it chose to discipline only strikers although nonstrikers were equally culpable). We believe, however, that the Board failed to adequately consider the respective nature of the misconduct by Hockett and Hayman. Although Hayman may have been guilty of misconduct, his actions were taken in an attempt to protect himself from harm that may have resulted from his decision to cross a picket line. On the other hand, Hockett's misconduct was offensive rather than defensive. Even a strained analysis of Hockett's threat to Mossett does not allow an interpretation that it was in some way furthering his right to strike.[8] Moreover, Hockett's actions directly interfered with Mossett's exercise of his right not to strike. In light of this crucial distinction, substantial evidence does not support the finding by the Board that Hayman's conduct was more serious than Hockett's and thus, Chesapeake violated sections 8(a)(3) and (1) by discharging Hockett and not discharging Hayman. Therefore, we deny enforcement of this portion of the Board's order.
 
 VII.
 
 38
 In summary, we grant enforcement of that portion of the Board's order finding that Chesapeake violated sections 8(a)(5) and (1) by bargaining to impasse over nonmandatory subjects of collective bargaining and that it violated sections 8(a)(3) and (1) by discharging Jennis Collins. We deny enforcement of the Board's order in all other respects.
 
 
 39
 ENFORCEMENT GRANTED IN PART AND DENIED IN PART.
 
 
 40
 WIDENER, Circuit Judge, joined.
 
 
 41
 K.K. HALL, Circuit Judge, concurring in part and dissenting in part:
 
 
 42
 I thoroughly agree with Parts I, II, and VI of the majority's opinion. I disagree, however, with the conclusion drawn in Part III of the majority's opinion that the strike was converted to an economic strike on September 18, 1985. Although the initial unfair labor practice involving the EEO matter was rectified by the Company's September 18 proposal, the Company's refusal to clearly and unambiguously state that it would, in conjunction with its other September 18 proposals, immediately and unconditionally reinstate all of the strikers precluded conversion to an economic strike. I also disagree with Parts IV and V because the conclusions therein flow inexorably from the conclusion that the strike lost its unfair labor practice status on September 18. I concur in the judgment to the extent it denies enforcement of the Board's order regarding the reinstatement of Hockett. I dissent, however, from the majority's refusal to enforce the Board's order in all other respects.[1]
 
 
 43
 Employees in an unfair labor practices strike are entitled to reinstatement to their jobs with back pay. Maestro Plastics Corp. v. NLRB, 350 U.S. 270, 278 (1956). The hiring of replacement workers during an unfair labor practice strike does not in any way diminish these reinstatement rights. NLRB v. Jarm Enterprises, Inc., 785 F.2d 195, 202 (7th Cir.1986). By refusing to clearly extend unconditional reinstatement rights to the strikers between September 18 and November 4,[2] Chesapeake did not cleanse the strike of its unfair labor practices. The record provides ample evidence that the Company pointedly refused to clarify its position on reinstatement rights.
 
 
 44
 According to the Union representative's notes of the September 18 meeting, "the company will grant the striking employees the reemployment rights (if any) to which they are entitled by law." The Union's Regional President attended the September 18 bargaining session and testified that the Company's spokesman, when specifically asked to explain what such reinstatement rights might be, refused to do so. The Union's regional president later reduced the Union's counterproposals to a letter dated October 4 and forwarded it to the same Company spokesman. One proposal was "[t]hat the employees on the payroll prior to the strike would be offered employment to their former jobs and their seniority restored." The Company spokesman's October 8 reply again avoided a direct answer; instead, he wrote the following:
 
 
 45
 [W]e believe that those employees who have returned to work during the strike and those who have been hired since the strike began should have the right of the freedom of choice to decide whether to be members of the IWA. Furthermore, we question the continued vitality of dues-checkoff authorizations executed prior to the strike, and once the strike is ended, we do not wish to know who is or is not a member of the Union. For these reasons, we have proposed to delete Articles XXII and XXIII[3] from any contract to which we are able to agree. You have not responded to these concerns.
 
 
 46
 Under the circumstances, since neither side has changed its position since our meeting of September 18, I can see no point in setting up another meeting. If, on the other hand, there is a change in your position as set forth in your October 4 letter, we would be happy to meet.
 
 
 47
 No further assurances or explanations by the Company were forthcoming.
 
 
 48
 The majority focuses solely on the conflicts with the EEO Settlement to demonstrate that the September 18 Company proposals effected a conversion to an economic strike. I think those portions of the record cited above demonstrate that it would work a grave injustice to allow the Company to insist to impasse over a non-mandatory bargaining subject and then, after an unfair labor practice strike is initiated and replacement workers hired, withdraw the objectionable proposals but refuse to clearly offer to unconditionally reinstate all of the strikers should the revised proposals be accepted. Unfair labor practice strikers must not be placed in the position of having to guess whether they will be able to return to work should they decide not to continue to strike over economic issues only. Having created the ambiguity regarding the strikers' reinstatement rights, the Company should have the burden of showing that this was not a contributing factor in the continuation of the strike. See Pennypower Shop. News, Inc. v. NLRB, 726 F.2d 626, 629-30 (10th Cir.1984) (where company creates the ambiguity which reasonably caused striking employees to believe their employment status was questionable, "the burden of the ambiguity must fall on the company.") Absent a clear declaration that reinstatement rights would be honored, the strike was not converted to an economic strike.[4]
 
 
 49
 If, as I have concluded, the strike continued as an unfair labor practice strike, then obviously the refusal to fully reinstate the strikers after the strikers unconditionally offered to return to work was illegal, and, therefore, the Board's order to reinstate those workers should be enforced. It is also evident that the Company's unlawful acts, particularly the denial of reinstatement rights, were the primary causes of the Union's loss of majority status. Inasmuch as an employer cannot rely on " 'a loss of majority status arising from its own unfair labor practices,' " NLRB v. No-Southern Dyeing and Finishing, Inc., 444 F.2d 11, 15 (4th Cir.1971) (quoting NLRB v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 n. 4 (8th Cir.1969)), the portion of the Board's order that the Company recognize and bargain with the Union should also be enforced.[5] Finally, it follows that if the unfair labor practice strike continued as such and the Company should be ordered to reinstate the strikers, then the removal from the "rehire list," discussed in Part V of the majority opinion, and the termination of non-responding strikers, should not be permitted to stand.
 
 
 
 [1]
 Section 7 of the EEO Settlement Agreement set forth the qualifications for maintenance department positions and the procedures for filling vacancies in these positions. Section 8 related to maintenance apprentice training and apprenticeship vacancies. Section 9 established the qualifications for foreman and leadman positions and the procedures for filling vacancies in those positions. Section 10 provided procedures for the hiring of maintenance and production employees from outside applicants. Section 11 related to disqualification from a position during a trial and training period following promotion, and reinstatement of the disqualified employee to his former position. Section 12 established procedures for overtime work and obtaining qualified replacements when an employee desired not to work overtime
 
 
 [2]
 At the time of the petition there were 195 active bargaining unit employees, 62 employees on the preferential rehire list, and 6 employees who had been discharged for strike misconduct. Thus, the petition was signed by over one-half of the employees in the bargaining unit
 
 
 [3]
 The Board affirmed this finding and Chesapeake does not challenge it here. Thus, we summarily enforce the portion of the Board's order relating to the discharge of Jennis Collins
 
 
 [4]
 The Board also modified the ALJ's order with respect to the reinstatement of strikers who had offered to return to work. The ALJ ordered backpay calculated from five days after the offer to return. However, the Board ordered backpay computed from the date of the offer to return, finding that a five-day grace period "has no useful purpose" where the employer has refused reinstatement
 
 
 [5]
 Chesapeake contends that the ALJ erred by excluding testimony that Chesapeake intended the provisions to remain subject to collective bargaining. The Board found that the testimony was not "the kind of bargaining history evidence that may serve to cast light on the meaning of ambiguous contract language." We agree that the testimony was properly excluded
 
 
 [6]
 Additionally, in agreeing with the ALJ that the September 18 proposal did not alter the nature of the strike, the Board made no mention of a conflict between Chesapeake's proposal and article 11 of the EEO Settlement Agreement. However, in its brief the Board does contend, although incorrectly, that Chesapeake's proposal conflicted with the EEO Settlement Agreement because it eliminated the "safety net" provision
 
 
 [7]
 As noted, Chesapeake continued to reinstate strikers until November 4, 1985
 
 
 [8]
 Because we agree with the ALJ that Hockett's conduct in threatening Mossett justified his termination, we need not address the allegations that Hockett was involved in a rock throwing incident
 K.K. HALL, Circuit Judge, concurs in part and dissents in part.
 
 
 [1]
 Although the majority "grant[ed] enforcement of that portion of the Board's order finding that Chesapeake violated sections 8(a)(5) and (1) by bargaining to impasse over nonmandatory subjects of collective bargaining ...," I am unable to discern how this ruling aids the Union. By upholding Chesapeake's withdrawal of recognition of the Union, enforcement of the Board's order to "cease and desist from ... refusing to bargain with the Union by negotiating to impasse on a nonmandatory subject ..." is an empty gesture
 
 
 [2]
 On November 4, 1985, Chesapeake initiated its preferential hiring list for those strikers who had not by then returned to work. From this point forward, it was clear that the strikers would not be automatically reinstated
 
 
 [3]
 Article XXII of the labor agreement which expired on June 18, 1985, required that all Chesapeake employees "become and maintain membership in the Union for the duration of this Agreement." Article XXIII authorized the deduction of Union dues from consenting employees
 
 
 [4]
 Despite the Board's failure to rely on the Company's refusal to clarify its reinstatement position as grounds for concluding that the strike was not purged of its unfair labor practice character, I would nevertheless enforce the Board's reinstatement rulings because of the primacy of the reinstatement issue in any strike. I do not suggest that every correction of unfair labor practices must also be accompanied by a declaration of reinstatement rights in order for a conversion to be effected. Nonetheless, where an employer intentionally refuses to clarify the issue, I would unhesitantly apply this principle
 
 
 [5]
 If the Company must bargain with the Union, then the duty of good faith requires that the information requested by the Union's April 22 letter be furnished. I would therefore also enforce this portion of the Board's order